UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA XIA and PAUL PRIVITERA,

                                    Plaintiffs,

– against –

65 WEST 87TH STREET HOUSING
DEVELOPMENT FUND CORPORATION,
CHRISTINE ELBERT, SAMANTHA PINKOWITZ,
ANTHONY SARMIENTO, and ANGELA ROJO,

                                    Defendants.

**OPINION & ORDER**
20 Civ. 03576 (ER)

Ramos, D.J.:

       Eva Xia and Paul Privitera, a married couple, claim that members of the Board of a building located at 65 W. 87th Street discriminated against them by denying their application to purchase an apartment in the building, due to Ms. Xia's protected status as an Asian American. They raise claims under the Fair Housing Act, the Civil Rights Act of 1866, New York State Human Rights Law, and the New York City Administrative Code. Defendants moved to dismiss the Complaint.

       For the reasons set forth below, the motion to dismiss is DENIED.

**I.    BACKGROUND**

**A.    The Search for Apartment 4**

       Eva Xia, a Chinese American woman, and her husband, Paul Privitera, a white man, began their search for a Manhattan home to purchase in mid-2019.[1] In June 2019,

---

[1] Unless otherwise noted, all facts in Section I are taken from Plaintiffs' Complaint. Doc. 1.

they learned that Apartment 4 of 65 W. 87th Street was for sale by Orlando Rymer, the current owner of the unit. The unit was for sale at a below-market price because the building was owned by a New York Housing Development Fund Corporation ("HDFC").

An HDFC is a type of coop that provides affordable housing to individuals with qualifying incomes. The tenants of an HDFC are both its shareholders and members of its Board of Directors. The coop's Certificate of Incorporation states that the building will provide housing for persons or families who earn "no more than 165% of the median income" of the statistical area "as determined from time to time by the Department of Housing and Urban Development."[2]  Doc. 29-1 at 5. In exchange for limiting the income of tenants to 165% of Area Median Income ("AMI"),[3] an HDFC receives reduced real estate taxes and financial assistance from New York City's Department of Housing Preservation & Development. Because prospective buyers are required to meet these income requirements, the seller of a unit in a building owned by an HDFC must often refer a buyer to the Board of Directors for approval before a sale can be finalized.

Xia and Privitera attended an open house for Apartment 4 on June 23, 2019. At that time, they spoke with Rymer's broker, Sandra Balan, who indicated that in order to apply for the apartment they were required to submit an offer form, a financial statement, and their two most recent tax returns, which were for 2017 and 2018 at the time. The couple submitted both an offer on the unit and the required income verification

---

[2] While the Complaint does not directly attach the Certificate of Incorporation, it does incorporate it by reference. *See, e.g.*, Complaint at ¶ 134; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir. 1999).

[3] Area Median Income is the median income for a specific city, as defined each year by the United States Department of Housing and Urban Development ("HUD"). *See* NYC DPH, *Affordable Housing: Area Median Income*, 2020, https://www1.nyc.gov/site/hpd/services-and-information/area-median-income.page.

information that day. The income verification information included two IRS Tax Return Transcripts and the couple's 2017 and 2018 tax returns.

Balan performed a preliminary review of the Plaintiffs' application and determined that they would likely qualify to purchase the unit. She forwarded the offer and application to Rymer, who accepted the offer on June 26. Rymer then forwarded Xia and Privitera's materials to the Board of Directors for approval.

### B. Due Diligence and the First Application

The approval process began on June 28, when the corporation provided Xia and Privitera their by-laws and proprietary lease. The couple's lawyer, Justin Waiser, emailed the Board of Directors on July 9 asking for further relevant information. During this correspondence, Mr. Waiser formally introduced the Board to his clients, writing, "The other person on the email was my client Eva Xia. She and her husband are my clients…" Defendant Elbert replied to this email on July 12. He asked for the completion of a newly required "Due Diligence Form" and the payment of a $250 application fee to continue the due diligence process. There was no due date given for this form or payment. He sent this email only to Mr. Waiser; he did not copy either Xia or Privitera.

As the approval process continued, Xia and Privitera entered into a contract with Rymer on July 18 to purchase the apartment for $900,000 in cash, with a $90,000 deposit. The purchase price was equal to or above the sale price of recent apartment sales in the building, which were also purchased with cash. The contract required confirmation that the purchaser had examined the "Lease, the Corporation's Certificate of Corporation, By-laws, House Rules," and the most recent financial information related to the

3

corporation. Doc. 29-4 at 9.  The contract was contingent on approval by the Board of Directors.

The next day, Balan emailed Xia and Privitera a copy of the HDFC's purchase application.  This same application had been approved for use in connection with the purchase of apartments by four of the members of the current Board.

The couple submitted the application to Balan on August 22.  However, the Board did not consider this application, as they had decided to the revise the form to include additional requirements and fees.  On August 29, the Board of Directors sent an email to Rymer stating that, based on their failure to pay the $250 due diligence fee, Plaintiffs "may not be a good fit for the building."  It was only on September 5, after that email, that Xia and Privitera learned about the new $250 due diligence fee and form from Mr. Waiser.  They submitted the payment to the HDFC the next day, writing an apology for the miscommunication and stating that they "would have submitted the payment immediately" if they had known about it.

### C. The Second Application

The Board sent Balan, Rymer's broker, a revised buyer application on September 27.  This application included an increase in the application processing, financing, due diligence, primary residence, and insurance guarantee fees.  It also required the submission of the contract between Mr. Rymer and his attorney and broker, the contract between Xia and Privitera and their attorney and broker, and copies of photo identification of all the attorneys and brokers involved.  Xia and Privitera also submitted updated financial documents with their 2017 and 2018 total income "as reflected on [their] federal tax return[s]," as required by the purchase application.  *See* Doc. 29-4 at

4

42. They also included their estimated individual incomes for 2019. *Id.* Their stated adjusted gross incomes for 2017 and 2018 were $174,955 and $136,242, respectively. *Id.* The 2017 figure included capital gains from the sale of the couple's previous home in California. *See* Doc. 30, Pls. Opp., at 9 n.2. However, the 2018 figure did not include the proceeds from the couple's sale of an apartment in Manhattan in 2018.[4] The 165% of AMI cap for a family of four was $176,055 for 2019 in New York City. *See* Pls. Opp. at 12.

Plaintiffs submitted the updated application, with a photo of Ms. Xia and her family, on November 19, 2019. Their application cover letter also mentioned that Ms. Xia was born in China.

### D.     The Third Application and Rejection

Ms. Balan emailed Xia and Privitera on January 8, 2020, advising them of additional new requirements that the building's attorney, Andrea Shapiro, said that the application also required. Plaintiffs were now required to submit signed affidavits stating they had no conflicts in the transaction. The Board also required that the Plaintiffs submit another application package with updated financial information.

The couple began filling out the application form over the next month. Although they requested the affidavit forms immediately and were told Ms. Shapiro would provide them soon, Ms. Shapiro did not send them to Xia and Privitera until February 2. In a February 14 email, Ms. Balan informed them that the Board had set a February 17 deadline for submission of all forms.

---

[4] The significance of the proceeds from these sales is described in more detail in Section 3.A., *infra*.

5

Xia and Privitera submitted their third application on February 17. Along with the same photo of Ms. Xia and her family, this application included eight separate signed affidavits, the $90,000 cash deposit, and financial documents demonstrating their estimated total 2019 and 2020 adjusted gross incomes. They stated adjusted gross incomes of $139,493 and $134,100 for 2019 and 2020, respectively. Their 2020 income did not reflect the expected sale of their current apartment. The 165% of AMI cap for a family of four is $187,605 for 2020 in New York City. Doc. 28, Defs' Br. at 5.

The Board of Directors rejected the couple's application on March 3, 2020. It transmitted the rejection via Ms. Shapiro, but no reason was given. Xia and Privitera wrote to the Board on multiple occasions, both through email and certified letters, but did not receive a response. As of the date of Plaintiffs' complaint on May 7, 2020, Apartment 4 had yet to be sold.

### E.     Experiences of Other Tenants

In support of their claims of discrimination against Asian Americans, the Plaintiffs make several allegations regarding the experiences of other tenants with the building's Board.

They allege that Mr. Rymer's roommate, Cindy Zhou, has suffered discrimination by members of the Board. In Board emails, she has been described as a "squatter" by Defendant Rojo and characterized – similarly to Plaintiffs – as "not a good fit" for the building. Defendant Rojo, who lived in the apartment above Rymer, also persistently pounded on the floor directly above Ms. Zhou when she lived with Mr. Rymer. No person of Chinese or Asian descent has ever been approved to purchase an apartment in the building.

6

In contrast to Plaintiffs' experience, all of the three most recent purchases required only one application—on the same form that was submitted by Xia and Privitera in August 2019. All closed in four months or less. Defendant Sarmiento used the same application when he and his wife purchased Apartment 1 in 2016. He was also interviewed by the Board within one month of signing the purchase contract and closed the sale within three months. The sale of Apartment 2 in 2015 took two months after contract-signing, and Apartment 3 took four months.

### F. Procedural History

The instant complaint was filed on May 7, 2020. The Defendants, 65 West 87th Street Housing Development Fund Corporation, Christine Elbert, Samantha Pinkowitz, Anthony Sarmiento, and Angela Rojo, claim that the complaint should be dismissed because Plaintiffs were not qualified applicants and because they do not allege facts that raise an inference of discrimination. Defendants filed this motion on July 28, 2020.

## II. LEGAL STANDARD

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). However, this "flexible 'plausibility

standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . .").  "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### B. Fair Housing Act Claims

The Fair Housing Act ("FHA") prohibits the denial of housing due to race, color, religion, sex, familial status, or national origin.  42 U.S.C. § 3604.  A complaint alleging

discrimination under the FHA must allege facts that plausibly give rise to an inference of discrimination.  To establish a prima facie case of racial discrimination, the plaintiff must ultimately show that:  (1) they are a "member of a racial minority"; (2) they "applied for and were qualified to" rent or purchase the housing in question; (3) they were denied the opportunity to rent, purchase, inspect or negotiate for the sale of the home; and (4) "the housing opportunity remained available."  *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 617 (S.D.N.Y. 2011).  However, a plaintiff need not fully establish their prima facie case at the motion to dismiss stage.  Rather, it is sufficient that a plaintiff "state her protected status, set forth the circumstances under which she was treated differently, and include an allegation that this differential treatment was on the basis of her protected status."  *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013).

Additionally, for a disparate-treatment claim under the FHA, Plaintiffs must ultimately establish discriminatory intent or motive to establish a prima facie case.  *Texas Dep't. of Hous. & Comty. Affairs v. Inclusive Communities Project, Inc.*, 517 U.S. 519, 524 (2015).  However, to survive a motion to dismiss, a plaintiff need only allege facts that "indicate the possibility of discrimination" to present a plausible claim of disparate treatment.  *Boykin v. KeyCorp.*, 521 F.3d 202, 215 (2d Cir. 2008).  Plaintiffs do not need to allege "discriminatory animus" for their disparate treatment claim to be "sufficiently pleaded" under the FHA.  *Id*.

9

### III. DISCUSSION

#### A. Plaintiffs Plausibly Allege that They Met the Objective Requirements to Purchase the Apartment

Defendants argue that Plaintiffs were not "qualified" to purchase Apartment 4 and therefore have not established the second requirement of their prima facia case. Defs' Br. at 8. To "financially qualify" for housing under the FHA, Plaintiffs must satisfy the objective requirements that the owner establishes. *Mitchell v. Shane*, 350 F.3d 39, 47–48 (2d Cir. 2003); *see also Kennedy v. Related Mgmt.*, No. 08 Civ. 3969 (PAC), 2009 WL 2222530, at *4 (S.D.N.Y. July 23, 2009) ("To satisfy the 'qualified' element … the renter must satisfy the applicable criteria that the owner established."). Thus, at the motion to dismiss stage, Plaintiffs must plausibly allege that they met the objective requirements.

In this case, however, it is unclear what the objective requirements were for an applicant for an apartment at 65 W. 87th Street—at least regarding how an applicant's "income" is defined. The coop's Certificate of Incorporation states that it will provide housing for those who earn "no more than 165%" of the Area Median Income, or AMI, "as determined from time to time by the Department of Housing and Urban Development." Doc. 29-1 at 5. The base AMI figure is determined annually by HUD and is generally presented as a fixed sum. Doc. 29-3 at 2, 4, 6, 8 (listing AMIs for New York City from 2017-20). Thus, applicants must calculate their income and assess whether it exceeds 165% of the figure provided by HUD. At issue here is how income is calculated.

The application form used by Plaintiffs asked for "Total Income," defined as "your adjusted gross income as reflected on your federal tax return." Doc. 29-4 at 42. Following this instruction, Plaintiffs' second and third applications represented their

10

adjusted gross income as reported on their most recent tax returns, which amounted to $174,955 and $136,242 for 2017 and 2018, respectively. *Id.*; Doc. 29-7 at 42. It is undisputed that Plaintiffs disclosed their 2017 and 2018 incomes as they were reported on their tax returns for those years. These figures included proceeds from the sale of a 2017 California apartment, which Plaintiffs held before they relocated to New York. Pls.' Opp. at 9 n.2. The figures did not, however, include the proceeds of Plaintiffs' 2018 sale of a previous Manhattan apartment. Plaintiffs' estimated 2019 and 2020 adjusted gross incomes at the time of the third application were $139,493 and $134,100, respectively, but they did not have federal tax returns for those years at the time of application. Defs' Br. at 5.

Defendants take issue with Plaintiffs' reported income on several bases, in each case arguing that Plaintiffs were not financially qualified. First, Defendants argue that Plaintiffs' 2017 income, which included proceeds from the sale of the California home, exceeded 165% of the 2017 AMI cap. They base this on the fact that Plaintiffs' stated income of $174,955 exceeded $141,753, which was 165% AMI for a family of three in 2017.[5] Second, with respect to their reported 2018 income, Defendants argue that Plaintiffs' financial disclosures should have included income derived from the 2018 real estate sale, based on relevant tax code. Doc. 35, Defs' Reply, at 5. They further argue that the Board has discretion to calculate income qualification as it sees fit, which may include asking for net income from all assets, such as proceeds from real estate sales. *Id.* at 3. Thus, Defendants argue that they properly denied Plaintiffs' application because

---

[5] AMI is calculated differently for differently sized families. In 2017, Plaintiffs only had one child, so Defendants argue that the AMI figure for a family of three is the proper figure to use when assessing their income for that year. Defs' Reply at 4. Plaintiffs had a second child in 2019, so they are now a family of four.

11

Plaintiffs' 2018 income would have exceeded 165% of AMI for 2018, had the apartment sale proceeds been included in their 2018 tax returns.  *Id*.  Finally, Defendants argue that Plaintiffs' 2020 income will also likely exceed the 165% AMI cap, because they "intended to sell their Midtown Apartment," and those profits would push them over the income threshold.  *Id.* at 7.

Plaintiffs allege that they were financially qualified because their applications accurately reflected their adjusted gross income as reported in their 2017 and 2018 tax returns, and because both of these figures are less than 165% AMI for a family of four in 2019.  Pls. Opp. at 12.  Plaintiffs do not dispute that their 2017 income (which included capital gains from their 2017 property sale) exceeded 165% AMI based on the 2017 AMI limit for a family of three.  *Id.*  However, they argue they must only show that their income is less than the 2019 limit for a family of four, because their purchase application was submitted in 2019.  *Id.*  ("Plaintiffs were applying to buy an apartment in 2019, not in 2017 or 2018.  That Plaintiffs may have had too much income to qualify to purchase a unit in *2017* is irrelevant.") (emphasis in original).  Plaintiffs further argue that they properly excluded income from the 2018 sale in their 2018 tax returns pursuant to 26 U.S.C. § 121 (laying out circumstances in which proceeds from property sales should not be included in one's gross income).  In Plaintiffs' view, all that was required by the Board's application was their income as reported in their 2017 and 2018 tax returns and an estimate of 2019's gross income, all of which they properly submitted.

Plaintiffs have adequately pleaded that they met the objective requirements for purchasing Apartment 4 at this juncture.  In their Complaint, they allege that they were financially qualified, pursuant to both statutory qualifications and the Board's

12

qualifications as laid out in the Certificate of Incorporation and purchase application.  *See* ¶¶ 67, 70, 72;  Doc. 29-1 at 5;  Doc. 29-4 at 42.  Moreover, Plaintiffs cite to several sources to plausibly allege that their income has not exceeded the 165% AMI cap for 2019.[6]  For example, the Plaintiffs point to language in their purchase application that asked for Plaintiffs' adjusted gross income as reported in their tax returns, without explicitly requesting disclosure or calculation of one-time payments such as proceeds from property sales.  Doc. 29-4 at 42–43.  It is undisputed that they provided this information, and that the amounts they disclosed would have made them qualified applicants based on a figure of 165% AMI for a family of four in 2019.  Moreover, Plaintiffs' position that their 2017 and 2018 incomes should be compared to 165% of AMI for 2019 (as opposed to the AMI caps for 2017 and 2018) is also plausible.  Pls. Opp. at 12.  The purchase application simply asks for "adjusted gross income as reflected in your federal tax return," without specifying which year's AMI cap these figures would be compared to.  The Certificate of Incorporation is similarly ambiguous, noting only that qualified applicants' income cannot exceed 165% AMI "as determined from time to time by [HUD]."  Doc. 29-1 at 5.  While Defendants have raised valid questions about how best to interpret these documents to calculate a qualifying income, it is not necessary to decide who is correct at this stage, so long as Plaintiffs' interpretation is plausible.

Similarly, Defendants' argument that Plaintiffs *should* have disclosed a different income amount in their underlying 2018 tax returns is also premature.  *See* Defs' Reply at

---

[6] The parties discuss several other documents that were not incorporated by reference into the Complaint and are thus not discussed herein, including the HUD's Handbook and the New York City Affordable Housing Applicant Income Guide. Pls.' Opp. at 9–10;  Defs' Reply at 3–5. However, Plaintiffs' allegation that they provided their adjusted gross incomes based on their tax returns, as required by the application, is both sufficiently alleged in the Complaint and is all that is necessary to resolve this motion.

13

5 (arguing that Plaintiffs should have disclosed the 2018 apartment sale in their 2018 tax returns under 26 U.S.C. § 121 based on their purported years of residence in that apartment). The question for a motion to dismiss is whether Plaintiffs have *plausibly* alleged facts showing that they were qualified. Here, Plaintiffs have proffered evidence showing what was required by Defendants' application (income "as reflected on [their] federal tax return[s]" from 2017–19), and also showing that they complied with these application requirements. Doc. 29-4 at 42–43. Defendants have identified potential questions of fact as to whether there were errors in the underlying forms. However, such issues are better resolved at the summary judgment stage.[7]

        To be sure, this decision does not mean that real estate sales cannot be utilized to determine if an applicant's income exceeds the 165% AMI cap as a matter of law. Nor does this amount to a conclusion that Defendants are legally prohibited from comparing Plaintiffs' 2017 and 2018 incomes to the AMI caps for those years. It only means that Plaintiffs have plausibly pleaded that these methodologies are not what the application for Apartment 4 required. The actual objective income requirements for this HDFC will be determined through discovery. However, at the motion to dismiss stage, while Defendants urge different calculations, the Court draws all inferences in the Plaintiffs' favor. Thus, assuming that proceeds from real estate sales need not be included in the income calculation, Plaintiffs properly allege that they met the AMI requirements for the purchase of the apartment for a family of four in 2019. *See* Doc. 29-3 at 7, 9.

---

[7] The Court also notes that this argument was raised for the first time in Defendants' Reply Brief.

### B. Plaintiffs Have Sufficiently Pleaded Disparate Treatment Through an Inference of Discrimination

A plaintiff can survive a motion to dismiss in a disparate treatment case by alleging facts that support a plausible claim that the Plaintiff was a "member of a protected class," suffered relevant "adverse" treatment, and when those facts suggest "an inference of discriminatory motivation." *Palmer v. Fannie Mae*, 755 F.App'x. 43, 45 (2d Cir. 2018) (quoting *Littlejohn v. City of N.Y.,* 795 F.3d 297, 311 (2d Cir. 2015)). Plaintiffs do not have to allege facts showing animus on the basis of race to survive a motion to dismiss for a disparate treatment claim. *Conn. Fair Hous. Ctr. v. Corelogic Rental Prop. Sol., LLC*, 369 F. Supp. 3d 362, 377 (D. Conn. 2019). Plaintiffs must only meet the "minimal" burden of facts showing the possibility of differential treatment, without direct evidence of discrimination. *See Littlejohn*, 795 F.3d at 311.

An inference of discrimination can be shown through circumstances demonstrating that a person or group is treated differently from others who are "similarly situated." *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015);[8] *see also L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013) (disabled plaintiff adequately pleaded an inference of discrimination by alleging that applicants for rental properties without a disability were not asked to undergo background checks, but she was). In *Boykin v. KeyCorp*, for example, an African American woman alleged that KeyBank denied her home equity loan application unlawfully on the basis of her race, sex, and location of property. 521 F.3d 202, 215–16 (2d Cir. 2008). The court found that

---

[8] While *Littlejohn* arose in the context of employment discrimination under Title VII, such claims use the same *McDonnell Douglas* burden-shifting framework on the merits as FHA claims do. Indeed, in *Williams v. N.Y. City Hous. Auth.*, the Second Circuit noted that pleading standards under Title VII "apply[] with equal force to any claim . . . that the *McDonnell Douglas* framework covers." 458 F.3d 67, 72 (2d Cir. 2006).

15

the pleading was sufficient when it set forth the plaintiff's protected status, the circumstances under which she was treated differently, and an allegation that this treatment was on the basis of the protected status. *Id.*

Plaintiffs allege that Defendants treated them differently on the basis of Ms. Xia's race. They state that Defendants learned of Ms. Xia's name—and thus her racial identity—prior to the Plaintiffs submitting their first application in August 2019. *See* Compl. ¶¶ 50, 79, 85. They further note that a photo of Ms. Xia was attached to Plaintiffs' November 2019 and February 2020 applications. *See* Doc. 29-4 at 5; Doc. 29-7 at 6. Plaintiffs' November 2019 and February 2020 application cover letters also state that Ms. Xia was born in China. Doc. 29-4 at 4; Doc. 29-7 at 5. Defendants argue that Plaintiffs do not adequately allege an inference of discrimination because Defendants only knew Ms. Xia's name at the time of her first application, and that this alone is an insufficient basis on which to infer her race. Defs' Br. at 14. Defendants further state that even if they learned of Ms. Xia's race in November 2019 when Plaintiffs submitted their application with a family photo, then Plaintiffs must also concede that Defendants' "supposed *racial* discrimination of Xia would have occurred[] *before* Defendants knew of Xia's race." Defs' Reply at 9.

Defendants rely on *Mitchell v. Shane* to argue that knowledge of Xia's surname was not enough for them to infer that she was Asian American. *See* 350 F.3d 39, 48–49 (2d Cir. 2003). In *Mitchell*, the Second Circuit granted summary judgment on FHA discrimination claims to a seller who had rejected African American buyers' offer on a house. *Id.* The court found that because the seller had not personally interacted with or seen pictures of the buyers (whose surnames were Mitchell), there was no basis to hold

16

that the sellers were aware of the Mitchells' race. *Id.* at 49. However, *Mitchell* did not purport to categorically prohibit the use of surnames as a basis for inferring someone's race. *Id.* Rather, it simply did not discuss the Mitchells' surnames as being at all indicative of their race. *Id.*[9] Here, however, Plaintiffs explicitly allege that "Xia" is a sufficiently identifiable Chinese surname such that Defendants would have had knowledge of Plaintiff's race upon learning it. Moreover, *Mitchell* arose at the summary judgment stage, at which Plaintiffs were required to fully make out their prima facie case; Plaintiffs do not face that evidentiary burden here. *See L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013) ("The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement.") (internal quotation marks and citation omitted).

While the propriety of considering surnames as a proxy for racial identity has not been squarely addressed by the Second Circuit, doing so is not without precedent at the district level.[10] As Plaintiffs point out, the Court in *Huertas v. East River Hous. Corp.* credited trial testimony that a defendant discriminated based on Jewish and Hispanic surnames in finding that they had violated the FHA. 674 F. Supp. 440, 445 (S.D.N.Y. 1987). Similarly, in another FHA disparate treatment case, the court found that a Mexican-American man adequately pleaded that Defendants were aware of his race when

---

[9] Because their surname is not explicitly discussed in the decision, it is unclear whether the plaintiffs in *Mitchell* raised an argument based on their surnames at all. However, even if they had, it is difficult to read *Mitchell* as stating that, because the surname "Mitchell" does not reasonably suggest an African American identity, reliance on surnames is categorically inappropriate.

[10] This question is also unresolved in similar anti-discrimination contexts. *See, e.g., Rodriguez v. Greiner*, No. 01 Civ. 2161 (RJH) (DCF), 2004 WL 2781720, at *7 n.7 (S.D.N.Y. Dec. 3, 2004) ("[T]he Second Circuit has not specifically ruled on the permissibility of inferring race from ethnic surnames [in the *Batson* context].").

"one of defendants' attorneys overheard De La Fuente speaking in Spanish with his son" and that they were aware of his "distinctively Spanish surname." *De La Fuente v. Sherry Netherland, Inc.*, No. 17 Civ. 4759 (PAE), 2018 WL 1597649, at *5 (S.D.N.Y. Mar. 27, 2018). The court in *De La Fuente* acknowledged that these facts "might be consistent with other racial or ethnic backgrounds," but concluded that they plausibly raised an inference of discrimination for the purposes of a motion to dismiss. *Id.* Thus, drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs' allegations here are similarly sufficient.

Defendants also claim that Plaintiffs do not adequately allege an inference of discrimination through the circumstances or treatment of "similarly situated" applicants. Defs' Reply at 7, 10–11. Plaintiffs, however, do plead differential treatment in their complaint. They allege multiple changes in application requirements, including increased fees and a much longer processing time, which Defendants required of them but not of other non-Asian applicants, due to Ms. Xia's race. Compl. ¶¶ 50-54, 58. Plaintiffs also point to a Defendant's statement that Plaintiffs were "not a good fit" shortly after learning of Ms. Xia's race. Compl. ¶ 123. Additionally, in support of the plausibility of their disparate treatment claim, Plaintiffs allege discriminatory behavior towards Mr. Rymer's Asian roommate, Ms. Zhou. As the only Asian tenant in the building's history, Plaintiffs claim that Defendants' treatment of Ms. Zhou, such as calling her a "squatter," "not a good fit," and persistently pounding on the floor directly above her, indicates the plausibility of differential treatment toward Ms. Xia on the basis of her race. Compl. ¶¶ 150-51.

Plaintiffs also allege procedural differences in the application process compared to recent applicants for the building. They point to the fact that they were required to provide four years' worth of financial information, to pay a due diligence fee, and to submit multiple applications, which was not required of recent, non-Asian applicants. Compl. ¶¶ 106-110, 158-160; *see also LeFrak*, 987 F. Supp. 2d at 401 (finding that imposition of a "more burdensome and delayed process," among other differences, plausibly raised an inference of discrimination). Like Plaintiffs, the three most recent purchasers offered to pay in cash. *See* Compl. ¶¶ 72, 106–07. Defendants correctly argue that Plaintiffs fail to allege that the other applicants were "similarly situated with respect to their financial portfolio (and their adjusted gross income)" or that other applicants "engaged in major real estate transactions, producing substantial gains…" Defs' Reply at 11. However, such detailed allegations are not necessary to survive a motion to dismiss. *LeFrak*, 987 F. Supp. 2d at 401 (noting that plaintiffs in FHA cases need not make out their prima facie case at the motion to dismiss stage). Moreover, as discussed in Section III.A., *supra*, the relevance of prior real estate transactions to the building's objective requirements is disputed. Rather, viewed in the light most favorable to Plaintiffs, these applicants were also financially qualified, but were required to submit only one application, and those transactions closed within four months and required fewer fees. *See* Compl. ¶¶ 119-21. This is sufficient at the motion to dismiss stage.

Finally, in their pleadings, Plaintiffs allege that all of these changes in the application process began soon after Defendants learned of Ms. Xia's race. *See* Compl. ¶¶ 50, 57-59, 161. In doing so, they sufficiently allege this treatment was plausibly done on the basis of Ms. Xia's protected status. In sum, Plaintiffs' allegations, taken as true,

19

do indicate a possibility of discrimination and therefore present a plausible disparate treatment claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The parties are directed to appear for a telephonic conference on December 16, 2020, at 9:45am. To participate, the parties are directed to call (877) 411-9748 and enter access code 3029857# when prompted. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 27.

It is SO ORDERED.

Dated:   December 8, 2020
        New York, New York

                                                         Edgardo Ramos, U.S.D.J.