UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA XIA and PAUL PRIVITERA,

                    Plaintiffs,                                    No. 20 Civ. 3576 (ER)

          -against-

65 WEST 87TH STREET HOUSING
DEVELOPMENT FUND CORPORATION,
CHRISTINE ELBERT, SAMANTHA
PINKOWITZ, ANTHONY SARMIENTO, and
ANGELA ROJO,

                    Defendants.


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


Kaufman Lieb Lebowitz & Frick LLP
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

FACTS ..................................................................................................................................... 2

ARGUMENT ........................................................................................................................... 2

    I.    LEGAL STANDARDS ............................................................................................ 2

    II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ................... 4

        A.   Defendants' Stated Reasons for Plaintiffs' Rejection are Pretextual ................ 5

           1.   Plaintiffs' Application Process was Rife with Procedural Irregularities ........ 6

              a.   Defendants Overhauled the Purchase Application to Require New, Onerous Fees and Documentation ................................................ 6

              b.   The Board Deviated from Internal Procedures and Best Practices in Reviewing Plaintiffs' Application ................................................. 11

           2.   Defendants Departed from Ordinary Substantive Criteria in Deciding to Reject Plaintiffs' Application ...................................................................... 13

           3.   Discovery Revealed Direct Evidence of Anti-Asian Animus ........................ 16

        B.   Defendants Have Not Shown a Legitimate, Non-discriminatory Reason for Plaintiffs' Rejection ............................................................................ 19

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

*273 Lee Avenue Tenants Ass'n by Sanchez v. Steinmetz*,
   330 F.Supp.3d 778 (E.D.N.Y. 2018) ............................................. 3

*Abrams v. Dep't of Public Safety*, 764 F.3d 244 (2d Cir. 2014) ............................................. 18

*Belfi v. Prendergast*, 191 F.3d 129 (2d Cir. 1999) ....................................... 25

*Beyah v. Coughlin*, 789 F.2d 986 (2d Cir. 1986) ....................................... 3, 22

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ............................................. 2, 3

*Birch Fam. Servs., Inc. v. Wlody*, No. 21-1553, 2022 WL 1468160 (2d Cir. May 10, 2022) ... 4

*Broome v. Biondi*, 17 F.Supp.2d 211 (S.D.N.Y. 1997) ........................................ 13

*Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*,
   719 F.3d 322 (4th Cir. 2013) ...................................... 13

*Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196 (2d Cir. 1995) .................................... 5, 19

*Fair Hous. Justice Ctr., Inc. v. Edgewater Park Owners Co-op.*,
   No. 10 Civ. 912, 2012 WL 762323 (S.D.N.Y. 2012) ................................. 3

*Fletcher v. Dakota*, 99 A.D.3d 43 (1st Dep't 2012) ................................ 20

*Gilead Comm'ty Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46 (D. Conn. 2019) ..... 13

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614 (2d Cir. 1996) ...................................... 3

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) .......................................... 3

*L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391 (S.D.N.Y. 2013) ............................................ 13

*Maun v. Edgemont Tarrytown Condo.*, 156 A.D.3d 873 (2d Dep't 2017) ........................... 20

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................... *passim*

*MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ..................... 5, 6, 16, 18

*Mitchell v. Century 21 Rustic Realty*, 233 F. Supp. 2d 418  (E.D.N.Y. 2002) ......................... 4

*Mitchell v. Shane*, 350 F.3d 39 (2d Cir. 2003) ...................................................... 3, 4

*Patterson v. Cnty. of Oneida*, 375 F.3d 206 (2d Cir. 2004) ...................................... 5

*Pease v. City of New York,* No. 19 Civ. 7693, 2021 WL 2651400 (S.D.N.Y. June 28, 2021) ... 4

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ................................................... 20

*Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202 (2d Cir. 2010) ..................... 13

*Renz v. Grey Advert., Inc.*, 135 F.3d 217 (2d Cir. 1997) ........................................... 5

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979) .................................. 4

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)) ...................................... 3, 5

*Rule v. Brine, Inc.,* 85 F.3d 1002 (2d Cir. 1996 ................................................... 2

*Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396 (1st Cir. 1990) 20

*Sassower v. Field*, 752 F. Supp. 1182 (S.D.N.Y. 1990) ........................................... 16

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987) ............................. 5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)....................... 5

**INTRODUCTION**

This case is classically unsuitable for resolution on summary judgment.

Plaintiffs Eva Xia and Paul Privitera are middle-income New Yorkers who applied to purchase their dream home in Defendants' HDFC co-op building (the "Building") in 2019. Though Plaintiffs were ideal buyers and candidates for the Building, soon after Defendants learned Xia's Asian surname, they mounted obstacle after obstacle to block Plaintiffs' application and, ultimately, the sale. They imposed $14,000 in onerous and arbitrary fees and deposits and required mountains of paperwork on tight deadlines. They applied unachievable standards to evaluate Plaintiffs' application that have never been applied to other purchasers—before or since. And after Plaintiffs jumped through all of Defendants' hoops, Defendants rejected them anyway and refused to say why.

Discovery has crystallized the reason for Plaintiffs' rejection: Defendants harbored anti-Asian animus toward Xia, and they did not want a Chinese woman residing in their Building. Documents and testimony prove that Defendant Rojo—who had been on a years-long crusade to remove a Chinese subtenant from the Building—advocated to reject Plaintiffs' application before she even reviewed it, *i.e.*, when all she knew was Xia's name. Text messages among the Defendants are replete with anti-Asian animus, and their emails reveal that Plaintiffs were not the "kind of neighbor" they wanted. Along with the procedural and substantive irregularities that dictated Plaintiffs' application process, there is ample evidence from which a reasonable jury could find that discrimination contributed to Plaintiffs' rejection.

Relying heavily on self-serving, post-discovery declarations, Defendants move for summary judgment by asserting that they rejected Plaintiffs for shifting and self-contradictory reasons relating to the substance of Plaintiffs' purchase application. But these reasons make no sense, and the evidence shows they did not motivate Plaintiffs'

1

rejection. Several of the purported deficiencies Defendants now claim to have found in Plaintiffs' application would have applied equally to Defendants' *own* applications when they purchased units in the Building, but were never cited as cause for concern. Defendants likewise take issue with aspects of Plaintiffs' application that were not raised during the application review process, and that first surfaced during litigation. Defendants' purported rationale for rejecting Plaintiffs was not legitimate and non-discriminatory; it was pretextual.

Defendants are not entitled to summary judgment based on their version of what happened. Genuine disputes exist as to nearly every single material fact, including, chiefly, whether Defendants were motivated by racial animus in their decision to reject Plaintiffs. These factual disputes must be decided by a jury.

## FACTS

Plaintiffs respectfully refer the Court to the accompanying Local Rule 56.1 Statement for a full recitation of the factual background relevant to this motion.

## ARGUMENT

## I.   LEGAL STANDARDS

Summary judgment is proper only if Defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). In considering Defendants' motion, the Court may not make credibility determinations or weigh the evidence, but instead must "draw all factual inferences in favor of, and take all factual assertions in the light most favorable to," Plaintiffs. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). "If there is any evidence in the record from any source from which a reasonable inference in [Plaintiffs'] favor may be drawn, [Defendants] simply cannot obtain

a summary judgment." *Binder & Binder PC*, 481 F.3d at 148 (internal quotation marks and citation omitted).

Because this is a discrimination case, special considerations apply. Specifically, "this Court must tread lightly in deciding whether summary judgment should be granted in a discrimination case that turns on intent." *273 Lee Avenue Tenants Ass'n by Sanchez v. Steinmetz*, 330 F.Supp.3d 778, 796 (E.D.N.Y. 2018). It should bear in mind that "[i]t is the rare occasion when discrimination boldly smacks one in the face, rather, it is 'often accomplished by discreet manipulations and hidden under a veil of self-declared innocence.'" *Id*. (citing *Fair Hous. Justice Ctr., Inc. v. Edgewater Park Owners Co-op.*, No. 10 Civ. 912, 2012 WL 762323, at *8 (S.D.N.Y. 2012); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)). Summary judgment is only appropriate if "no reasonable jury could find that the defendant's actions were motivated by discrimination." *Mitchell v. Shane*, 350 F.3d 39, 45 (2d Cir. 2003).

Finally, since "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "*must disregard all evidence favorable to the moving party that the jury is not required to believe.*" *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (internal quotation marks omitted, emphasis in original). Here, that includes the self-serving declarations submitted by each individual Defendant and defense counsel. Because "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), a declaration signed by an attorney who did not witness the underlying events cannot satisfy the strictures of Rule 56. *Beyah v. Coughlin*, 789 F.2d 986, 989-90 (2d Cir. 1986). Likewise, Defendants cannot carry their burden with post-discovery declarations, not subject to adversarial testing, that seek to change or correct their deposition testimony. *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

Because genuine disputes of material fact exist as to Plaintiffs' discrimination claims, Defendants' motion must be denied.

## II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT

Plaintiffs' discrimination claims are assessed under the *McDonnell Douglas* burden-shifting framework.[1] *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979). Once Plaintiffs establish a prima facie case of discrimination, the burden shifts to Defendants to assert a legitimate, nondiscriminatory rationale for the challenged decision. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If they can make that showing, the burden shifts back to Plaintiffs to demonstrate that discrimination was the real reason for Defendants' actions. *See Mitchell*, 350 F.3d 39.

Here, Defendants do not contest that Plaintiffs have established a *prima facie* case of discrimination; they proceed straight to step two of *McDonnell Douglas*. It is thus undisputed for purposes of this motion that (1) Plaintiffs are members of a protected class, as Ms. Xia is Chinese-American; (2) they sought and were qualified to purchase the apartment; (3) they were rejected; and (4) the apartment remained available thereafter. *See Mitchell*, 350 F.3d at 48.

Because it is Plaintiffs' burden on step three to show that Defendants' proffered reasons are pretextual and they intentionally discriminated against Plaintiffs based on race,

---

[1] Plaintiffs bring federal discrimination claims under the Fair Housing Act and 42 U.S.C. § 1981, which are both assessed under *McDonnell Douglas*. *Mitchell v. Century 21 Rustic Realty*, 233 F. Supp. 2d 418, 437 (E.D.N.Y. 2002). Plaintiffs bring analogous state and local claims under the New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL), which are evaluated under the same framework. *See Mitchell*, 350 F.3d at 47 n. 4 (applying same standard under FHA and NYSHRL); *see also Birch Fam. Servs., Inc. v. Wlody*, No. 21-1553, 2022 WL 1468160, at *2 (2d Cir. May 10, 2022) (applying same standard under FHA and NYCHRL). If Plaintiffs' federal claims survive this motion, their state and local claims necessarily survive too, as "similarly worded provisions of federal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise." N.Y.C. Admin. Code § 8-130(a); *Pease v. City of New York*, No. 19 Civ. 7693, 2021 WL 2651400, at *6 (S.D.N.Y. June 28, 2021) (noting effect of NYSHRL 2019 amendments was to "render the standard for claims closer to the standard under the NYCHRL").

we begin our analysis there. We then address Defendants' argument that they have provided a legitimate non-discriminatory basis for their actions at step two.

### A.        Defendants' Stated Reasons for Plaintiffs' Rejection are Pretextual

To demonstrate that a defendant's stated non-discriminatory reasons for an allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the [defendants'] proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995); *see Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). Any factual dispute as to whether discrimination played a motivating role is thus sufficient to defeat Defendants' motion, irrespective of whether Plaintiffs succeed in disproving their proffered nondiscriminatory rationales. *Renz v. Grey Advert., Inc.*, 135 F.3d 217, 222 n.3 (2d Cir. 1997) (holding that a "plaintiff is entitled to succeed by proving discriminatory motivation without proving that a proffered explanation is false").

"Intent to discriminate may be established in a number of ways." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir. 1987). "Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Rosen*, 928 F.2d at 533 (observing that, because a discrimination perpetrator "is unlikely to leave a 'smoking gun,'" the plaintiff in an intentional discrimination case is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence").

Indicia of invidious motive include the existence of procedural irregularities in the decision process, departures from usual substantive criteria, and contemporaneous statements and conduct by decision-makers evidencing animus. *MHANY Mgmt.*, 819 F.3d at 606. Here, evidence in each of these categories provides an ample basis from which a jury could conclude that discrimination motivated the rejection decision at least in part. Summary judgment must therefore be denied.

### 1. Plaintiffs' Application Process was Rife with Procedural Irregularities

The discovery record is replete with evidence that Defendants manipulated the application process to block Plaintiffs from purchasing in the Building.

### a. Defendants Overhauled the Purchase Application to Require New, Onerous Fees and Documentation

After Defendants learned Xia's name, and thus her race and national origin, they began a months-long process to burden Plaintiffs and deter them from purchasing a unit in the Building. By June 2019, Defendants were aware that Unit 4 was for sale. Ex. R at 63:4-7. Yet during a Board meeting on June 24, 2019, there was no mention of revising or updating the co-op's existing purchase application materials, which Sarmiento had used successfully when purchasing his home in 2016.

Defendants learned Xia's name on July 10, 2019. Ex. W at XIA002318. They then began circumventing Board bylaws and notice requirements—including by excluding two other Board members—to form a "Special Committee" for the sale of Unit 4.[2] On July 29,

---

[2] Although Defendants have asserted that excluding these two Board members was justified because they were interested parties in the sale, this is a matter of factual dispute. The evidence shows that neither had an actual conflict. One, Samantha Pinkowitz, was not involved in the sale, Ex. E at 38:20-40:25; Ex. P at 14:24-15:6. The other, Orlando Rymer—who was typically represented on the Board by proxy by Eliana Pena—was the seller of Unit 4. But sellers routinely participated in decisions to approve or reject prospective buyers at the Building prior to Plaintiffs' application. Ex. L at 120:14-24.

2019, Elbert initiated discussions with Sarmiento and Rojo concerning the formation of a special sales committee to "conduct all communications and decisions regarding the sale" of Unit 4, acknowledging "I am basically doing this now, unofficially, through this email." Ex. 30 at DEFS001403. All three quickly determined that they were available to attend a special Board meeting at noon on August 4, Ex. 30, but waited to inform other Board members until less than 24 hours before the meeting was scheduled to begin—in violation of the Building's bylaws, Ex. 11, Ex. 61 at DEFS006433. Unsurprisingly, only Elbert, Sarmiento, and Rojo attended the hastily called meeting, at which they appointed themselves as a "special committee" overseeing the sale. Ex. 12. The official meeting minutes claim that Rojo proposed the creation of the committee, *id.*, but Defendants' internal emails show that Elbert had raised the idea days earlier, Ex 30 at DEFS001399.

Although Defendants had known for a month that Plaintiffs imminently intended to submit a purchase application, the "special committee" decided upon its formation to invent a completely new and unprecedentedly burdensome purchase process specifically for Plaintiffs. The committee took nearly two additional months to overhaul the process, providing the seller's broker, Sandra Balan, with the revised application on September 27, 2019. Ex. PP. The new application demanded $12,000 more in fees and deposits than any prior applicant had been charged, including a $500 application fee (increased from $350), a $1,000 financing fee (increased from $300), a brand new $250 due diligence fee, a brand new $10,000 primary residence guarantee deposit, and a brand new $2,000 housing assistance administration fee. Exs. QQ, RR. Sarmiento testified that he was "concerned" that the $10,000 guarantee "was large and burdensome," Ex. R at 154:20-21, while Rojo agreed that this fee was "unusually high," Ex. L at 156:13-157:4. Balan testified that she was in "total shock" when she saw the fees imposed, as they were "astronomically high," and she had never seen comparable at any co-op, let alone an HDFC. Ex. E at 56:15-57:9. She recalled

that the primary residency guarantee fee left her "stunned for about five minutes," adding: "I have never in my life seen a fee like this, ever, ever, ever on any building I've worked in whether it be a co-op, condo or HDFC. I even showed it [to] my manager and he was shocked," *id.* 59:13-20. When Balan showed the fee schedule to Andrea Shapiro, the Board's *own* attorney, she too expressed shock and dismay. *Id.* at 79:24-80:19.

Defendants' purported justifications for these fee increases are transparently pretextual. Their insistence that the burden on Plaintiffs was mitigated by the refundable nature of certain fees ignores that HDFCs exist to create a path to home ownership for low- and middle-income New Yorkers who are unlikely to be able to spare $11,000 in "refundable" fees for the indefinite period of the sale's pendency. As Sarmiento observed in an email among the Defendants on November 16, 2019, these fees "could represent a liquidity hit for most anyone, even if financially stable," particularly given the uncertainty inherent in scheduling a closing. Ex. 38 at DEFS666. Moreover, in her deposition, Elbert conceded that, while the $10,000 "primary residency guarantee" Defendants imposed for Plaintiffs' application was nominally refundable, the Board retained total discretion to decide if their proof of primary residence was satisfactory to obtain the refund. Ex. G at 170:9-13. Notably, when Elbert herself applied to purchase her unit, she expressed outrage at being charged just $700 in fees, calling that amount "excessive" for an HDFC. Ex. 43 at DEFS3128.

More fundamentally, Defendants' failure to plausibly and consistently explain *why* the new fees were imposed strengthens the inference of improper purpose. For instance, in their post-discovery affidavits, Sarmiento and Elbert claim—in identical language—that the $10,000 primary residence guarantee was needed to "incentivize purchasers to live up to their commitment to reside at" the building. Elbert Aff. ¶ 14; Sarmiento Aff. ¶ 13. But after rejecting Plaintiffs' application, Defendants revised the application again and eliminated the

8

$10,000 deposit along with most of the other increased fees—belying their insistence that the increases were tied to the co-op's legitimate business needs. Ex. 27 at DEFS4826. Rojo testified that the fees in place in 2016 were sufficient, Ex. L at 73:18-25, and that she did not remember why the application fee was raised to $500 just as Plaintiffs were applying, *id.* at 155:21-156:2. Yet she now claims the increased fees were needed "to assure that the Coop was reimbursed for Board time spent on the transaction." Rojo Aff. ¶ 11. The credibility and sufficiency of Defendants' justifications for imposing these fees—*i.e.*, whether they reflect an intentional effort to block Plaintiffs from purchasing the apartment or were based on genuine fiscal concerns—are quintessential jury questions.

In addition to the astronomical fees, Defendants required Plaintiffs to include additional unnecessary documentation never sought from previous applicants. These burdensome requirements included furnishing copies of photo identification not only for Plaintiffs, but also for the seller and all parties' brokers and attorneys. Ex. QQ at DEFS4729. The application also included a byzantine "conflict of interest" matrix, requiring Plaintiffs to "indicate in detail the nature of the professional and/or personal relationship or affiliation" among every entity and person involved in the sale in any way (including, for example, between the Board's attorney and the credit verification company—information Plaintiffs obviously would not possess). *Id.* at DEFS4772-74. Plaintiffs made a good-faith effort to comply with these requirements in their November 2019 application, completing the matrix to the best of their ability and disclosing the full contract of sale. Ex. 17 at DEFS909-928.[3]

Despite Plaintiffs' efforts, Defendants determined that the conflict disclosures in the November 2019 application were insufficient and demanded additional assurances. In

---

[3] The parties' attorneys and the seller's brokerage firm declined to provide copies of their contracts with their clients, citing confidentiality and privilege concerns. Ex. 17 at DEFS930, 932.

9

January 2020, Board attorney Andrea Shapiro called Balan, explaining that "the board had contacted her, they were requiring additional information and I would need to come down to her office to go over" these supplemental application requirements. Ex. E at 70:3-6. At the meeting, Shapiro told Balan that "the board wanted these legal papers, these affidavits put together" concerning the relationships among all parties involved in the sale transaction. *Id.* at 71:7-8. She repeatedly noted that these requests had come from "Chris," meaning Christine Elbert. Ex. E at 75:17-76:5.[4] Shapiro proceeded to review hard copies of "e-mails from the board" describing the affidavits being sought while Balan looked on. *Id.* at 71:25-72:6. As she reviewed the Board's demands, Shapiro hand-wrote notes describing the required contents for each of the affidavits on a manila folder, which she instructed Ms. Balan to type up at her own office and email back to Shapiro. Ex. E at 76:6-77:11; Ex. 59 (copy of manila folder).[5] Later, after rejecting Plaintiffs' application, Defendants promptly eliminated the entire conflict of interest disclosure section of the purchase application. Ex. 27.

On top of these onerous disclosure requirements, Defendants also decided that because Plaintiffs' supplemental application materials would be submitted in 2020, Plaintiffs would need to verify their income for calendar year 2019. Ex. G at 189:12-21. Although Plaintiffs' 2019 tax return was not due for months, Defendants demanded that Plaintiffs submit their revised application on or before February 17, 2020—a federal holiday—and include copies of all Forms 1099 and W-2 for calendar year 2019, which are

---

[4] Shapiro's statements are non-hearsay under Federal Rule of Evidence 801(d)(2)(D).

[5] Although Defendants now claim that they never actually asked for these burdensome affidavits, Rojo testified in her deposition that she recalled the Board asking for affidavits from sale parties disclosing "if they knew they had any kind of relationship or knew anyone in the building." Ex. L at 171:9-12. She confirmed that this requirement—which has never been imposed on any applicant before or since Plaintiffs—was devised "between the lawyer, Christine and Anthony." *Id.* at 172:20-21. Defendants' belated denials at best create a question of fact that must be resolved by the finder of fact.

not required to be finalized until January 31. *Id.* at 190:9-19; Ex. E at 91:24-92:10. When Plaintiffs requested an extension of a few days to ensure that their attorney would have sufficient time to review the required affidavits, the Board rejected the request without explanation. Ex. G at 191:21-192:8; Ex. E at 92:11-93:17. As Ms. Balan testified, the Board's insistence on a particular submission deadline, and refusal to entertain the extension request, was "[e]xtremely unusual" because "the building has nothing to do with this deal, they're not selling this apartment . . . so if the seller did not care when the package was submitted and the buyer was working on it as quickly as possible," there was "no rhyme or reason" to the Board's imposition of its own deadline. Ex. E at 93:18-94:8.[6] A jury could infer improper motive from this irregularity alone.

### b.   The Board Deviated from Internal Procedures and Best Practices in Reviewing Plaintiffs' Application

The Board's insistence on conducting its own, searching review of Plaintiffs' financial qualifications was yet another procedural aberration in the application process. Defendants were contemporaneously aware that best practice for self-managed co-ops is to minimize the Board's contact with prospective buyers and allow a building attorney to review purchase applications for income eligibility and financial qualification. Ex. 38 at DEFS665. They therefore agreed before Plaintiffs submitted the November 2019 application that Shapiro would "do a first look to check for compliance with income caps and tax disclosure, as well as minimal financial resources . . . and checking for completeness." *Id.* at DEFS664.

At 1:58 a.m. on November 20, 2019, Elbert notified Rojo and Sarmiento that an electronic copy of Plaintiffs' application had been received by email, but that she had "not

---

[6] Defendants' stated explanation for imposing a rigid deadline—that the sale process was taking too long—is self-evidently pretextual. Obviously, refusing to grant a modest extension and thereby forcing Plaintiffs to submit an incomplete application package would increase the risk of a rejection, ultimately requiring the sale process to restart completely and extending the timeline by far more than a few days.

opened it" and had asked Shapiro to conduct an initial review. *Id.* Yet barely 12 hours later, Elbert sent another email noting that she "took a peak" [sic] and was already "ready to reject the application." Ex. 18 at DEFS1968. Rojo responded that evening, calling Plaintiffs "dishonest" and stating: "My vote is to reject the application." *Id.* She had not reviewed Plaintiffs' application at the time. Ex. L at 164:12-15.

After Shapiro reviewed Plaintiffs' application package, she told Ms. Balan that "she thought the board package was perfect," that there were "no issues" with Plaintiffs' eligibility under the applicable HDFC income caps, and that Plaintiffs were "absolutely" financially qualified to purchase Unit 4. Ex. E at 89:10-11. 90:7-8, 91:15-20. Other than the additional disclosure affidavits the Board had requested and Plaintiffs' Forms 1099 and W-2 for 2019, Shapiro considered Plaintiffs' application to be complete as of January 2020. *Id.* at 90:7-13. Yet when Defendants received Plaintiffs' supplemental February 2020 application, they rejected it without having Ms. Shapiro review it, without requesting any additional information from Plaintiffs, and without contacting any of their references. Ex. G at 193:7-194:7, 201:13-19. Rojo wrote in a contemporaneous email that she considered Plaintiffs' resubmitted application to be "[bullshit] and garbage" and seethed that Plaintiffs are "[d]riven by money." Ex. 19 at DEFS7039. She admitted she had not read the application when she wrote these statements. Ex. L at 177:12-25.

The numerous procedural irregularities that plagued Plaintiffs' application process from the moment they learned of Xia's race support an inference of discrimination. *See L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013) (holding that the imposition of "a more burdensome and delayed process" on plaintiffs plausibly raised an inference of discrimination); *Broome v. Biondi*, 17 F.Supp.2d 211, 217 (S.D.N.Y. 1997) (testimony that applicants "submitted references from former landlords and employers as part of their sublet application and that none of the Board members checked any of these references to

ask about the [plaintiffs] and their potential to be good tenants" supported jury finding of pretext); *accord, e.g.*, *Gilead Comm'ty Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 72 (D. Conn. 2019); *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013). Defendants' motion must therefore be denied.

### 2. Defendants Departed from Ordinary Substantive Criteria in Deciding to Reject Plaintiffs' Application

The record would also permit a jury to infer discriminatory intent from Defendants' "departures from usual substantive criteria" used in assessing purchase applications at the Building. *See Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202, 207 (2d Cir. 2010) (internal quotation marks omitted).

First, Defendants used a sui generis interpretation of the applicable HDFC income caps, requiring that Plaintiffs' income in years *prior* to their application fall below the applicable income cap based on their family size *at the time*. Ex. G at 30:14-25. This nonsensical rule was invented specifically to disqualify Plaintiffs and was never used to determine income eligibility in the past. For example, when Sarmiento and his wife applied to purchase their apartment in 2016, their 2015 federal tax return reflected an adjusted gross income of $134,548. Ex. 28 at DEFS8559. The income cap applicable to the building in 2015 was $142,395 for a household of four or $128,205 for a household of three. Ex. 7. Sarmiento's household size in 2015 was three, as his second child was born in 2016. *See* Ex. 28 at DEFS8559 (noting one dependent, a son, in 2015); *id.* at DEFS8540 (describing daughter as "newborn" in June 2016). Accordingly, had the Board applied the same absurd rule to Sarmiento's family that Defendants applied to Plaintiffs, Sarmiento would have been disqualified. Confronted with this discrepancy at her deposition, Elbert testified that perhaps the Board approved Sarmiento's application erroneously and stated that she would

need to "consult legal counsel" to determine whether the Board should take any remedial action. Ex. G at 108:18-109:22.

Regrettably, her post-discovery declaration does not mention the outcome of any such consultation. Presumably none ever occurred, because there is no conceivable reason why the Board of any HDFC would care whether an applicant satisfied an outdated income cap at a time years in the past, before one of their children was born. Balan, a Manhattan real estate broker with decades of experience, testified that she had never heard of any HDFC assessing income eligibility based on an applicant's household size in a year prior to the time of their application. Ex. E at 20:22-21:2.

Astoundingly, Defendants also used speculative projections about Plaintiffs' *future* income to disqualify them, again subjecting them to rules that were never applied to other applicants. Apparently based on Plaintiffs' stated intention to sell the apartment where they were living at the time they applied, Defendants decided that Plaintiffs would earn "approximately $55,000 in profit from the sale, making their 2020 expected income approximately $189,000," thereby disqualifying them. Br. at 10. It is unclear why Defendants believed they could predict the future purchase price of an apartment they had never seen with sufficient precision to determine that the sale would place Plaintiffs over the 2020 income cap by about $1,000. *See* Ex. N at 9 (listing 165% AMI for a family of four as $187,605 for 2020). Regardless, it is beyond serious dispute that the Board *never* considered future projected income to determine any other applicant's eligibility. As Elbert admitted, "once someone purchases in an HDFC it doesn't matter what family size you have or what income you have, you just need to meet it [the income cap] at the time of purchase." Ex. G at 56:6-9. Indeed, Elbert had specifically asked her own broker when she purchased her apartment at the Building in 2014: "How do the income limits work—only at purchase, or anytime during residency?" and was told: "[J]ust purchase." Ex. 44 at DEFS3119-20.

In addition, Defendants manipulated the definition of "income" to justify rejecting Plaintiffs' application. Defendants' own purchase application form expressly states that, for purposes of determining HDFC eligibility, "[i]ncome is defined as your adjusted gross income as reflected on your federal tax return." Ex. RR at DEFS9427. Sarmiento—Defendants' 30(b)(6) witness on "the financial qualifications or prerequisites to purchase a unit in the 65 West 87th Street HDFC at all times from 2014 to present"—confirmed in his deposition that the Board's policy was to use adjusted gross income ("AGI") to assess eligibility. Ex. R at 53:19-54:5. It is beyond dispute that Plaintiffs' AGI, as reported on the 2017 and 2018 tax returns that were submitted with their application, fell below the applicable 2019 income cap for a family of four. *Compare* Ex. 17 at DEFS813 (Plaintiffs' 2018 AGI reported as $136,242) *and* Ex. 17 at DEFS841 (Plaintiffs' 2017 AGI reported as $174,955), *with* Ex. N at 7 (listing 165% of AMI for a family of four in 2019 as $176,055). But in Plaintiffs' case, the Board determined that a different number—Plaintiffs' 2018 "total income"–was too high. Ex. G at 26:12-23. Pressed on the definition of "total income," Elbert was unable to answer. *Id.* at 81:11-83:17; *see also* Ex. 47 at DEFS4372.

Defendants' assertion that Plaintiffs exceeded the 2018 income cap because they were "not entitled" to exclude gains from the sale of their former primary residence in Harlem from taxable income, Br. at 10-11, strengthens—not weakens—the inference of discrimination. First, the purchase application given to Plaintiffs identifies the relevant income number as "adjusted gross income *as reflected on your federal tax return*"—not what inexpert Board members believe *should* have been reflected on the return. Ex. RR at DEFS9427 (emphasis added). There is no evidence that any other applicant's tax return data has ever been scrutinized and recalculated by the Board under its own understanding of IRS rules to generate a new income figure for use in making eligibility decisions. More to the point, if Defendants were genuinely concerned about whether gains for Plaintiffs' home sale

were properly excluded from their 2018 AGI, the logical response would have been to ask Plaintiffs about it. Had they done so, Plaintiffs would have explained that the December 2014 date listed in their purchase application was likely the date they purchased their current home. Plaintiffs in fact resided at the Harlem Apartment until the summer of 2015. *See* Ex. I at 15:2-21:8; Ex. 62. That simple clarification would have resolved Defendants' concerns, demonstrating that Plaintiffs in fact maintained the Harlem Apartment as their primary residence for more than two years, as required to take the homestead exclusion. *See* 26 U.S.C. § 121(a).

That Defendants never bothered to ask, and instead assumed that Plaintiffs were tax cheats to justify rejecting their application, is itself evidence of invidious motive. *See Sassower v. Field*, 752 F. Supp. 1182, 1189 (S.D.N.Y. 1990) (co-op board's failure to consider information that would have obviated their stated basis for rejecting plaintiffs was evidence of pretext). At the very least, the genuineness of Defendants' concerns about Plaintiffs' eligibility for the homestead exclusion in 2018 is a disputed question of fact that must be resolved at trial. Drawing all inferences in Plaintiffs' favor, a fact-finder could easily conclude that Defendants' aberrant approach to the substantive assessment of Plaintiffs' application supports an inference of discriminatory intent.

### 3.   Discovery Revealed Direct Evidence of Anti-Asian Animus

Discovery also revealed "contemporaneous statements by decision-makers evidencing animus." *MHANY Mgmt.*, 819 F.3d at 606. Most notably, Rojo's own testimony and that of other witnesses shows that Rojo harbors anti-Asian racial animus.

Prior to Plaintiffs' application, Rojo had supplemented her income—a fact she concealed from the IRS, Ex. L at 102:4-9—by renting out rooms in her unit to subtenants. One of these subtenants was an Asian woman named Cindy Zhou. *Id.* at 93:16-94:6. When Rojo and Zhou had a falling out, Zhou moved out of Rojo's apartment and into Unit 4,

where she sublet a room from Orlando Rymer. *Id.* at 95:21-96:12. At the same time Defendants were considering Plaintiffs' application, Rojo repeatedly ranted against Zhou to other Board members, saying she did not "approve of her residence in our FAMILY oriented BrownStone" (Ex. 23), calling her a "squatter" (Ex. 24), and announcing that she did "not approve of her been [sic] in our building" (Ex. 25 at DEFS7366). Incredibly, Rojo claimed in her deposition that she "adore[s] Cindy" and that these messages were not intended to communicate anything negative about her. Ex. L at 193:2-195:12. Separately, Elbert referred to Zhou in text messages as "miss Asian," Ex. 26 at DEFS11471—a term that she admitted was "weird." Ex. G at 216:2-5.

On March 9, 2020–just as the COVID-19 virus was beginning to spread in New York City after several months of remaining largely contained to mainland China–Rojo texted her neighbors about Zhou, ranting that she "for sure doesn't cleaning, disinfecting health hygiene [sic]" and might spread COVID-19 because she "does her shopping from Chinatown." Ex. 25 at DEFS7382. Despite being shown the text messages, which specifically referred to "the tenant living on the 4th floor," Rojo suddenly claimed that she might have meant a different fourth-floor tenant, other than Zhou, whose identity she could not recall. Ex. L at 204:21-206:8. No such person exists.

Rojo's testimony leaves little doubt that she considers Asian people to be unhygienic vectors of disease who make poor neighbors and are unfit to live in a family-oriented community. Crucially, her viciousness toward Zhou mirrors repeated statements she made about Plaintiffs throughout the period when they were seeking to purchase the apartment beneath hers. As early as August 2019, Rojo emailed Sarmiento and Elbert about Plaintiffs, writing, "I don't know if we want this kind of neighbor." Ex. 13. Then, the day after Plaintiffs submitted their November 2019 application, without bothering to review it, Rojo emailed Elbert and Sarmiento, stating: "I don't do well with dishonest/people and specially when

they play games . . . . My vote is to reject the application." Ex. 18 at DEFS1968. Likewise, immediately after Plaintiffs submitted their supplemental application in February 2020, Rojo characterized their submission as "garbage" and expressed her view that Plaintiffs were untrustworthy, dishonest, and greedy. Ex. 19 at DEFS7039. As the Second Circuit has repeatedly held, the use of language like that Rojo used to describe Plaintiffs and Zhou is evidence of discriminatory intent. *See Abrams v. Dep't of Public Safety*, 764 F.3d 244, 253 (2d Cir. 2014) (noting that "the phrasing 'better fit' or 'fitting in' *just might* have been about race; and . . . those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury"); *MHANY Mgmt.*, 819 F.3d at 608-09 (stated concerns about community's "flavor" and "character" were "code words for racial animus").

Indeed, Rojo repeatedly lobbied the other members of the Board to reject Plaintiffs *after* she learned Xia's race but *before* she learned any substantive information pertaining to Plaintiffs' application. *See, e.g.*, Ex. 14 at DEFS612 (September 8, 2019 email: "Sorry to say I'm not feeling it"); Ex. 16 at DEFS1731 (September 11, 2019 email: "I'm extremely very uncomfortable and not satisfied with any of them, I'm thinking we should reject the applicant"). Given that Rojo knew nothing except Xia's name (and, therefore, her race) at the time of these statements, and had elsewhere made plain her distrust of and distaste for her only Asian neighbor in starkly racialized terms, a jury could infer that her unexplained hostility toward Plaintiffs' application was motivated by racial animus.

That inference is further supported by other record evidence suggesting a pattern on Defendants' part of discriminating against Asian Americans. Other than Plaintiffs, the Board has only voted to reject one other application for purchase—those buyers, like Plaintiffs, were an interracial couple consisting of a European husband and Asian wife. *See* Ex. L at 62:2-7; 68:7-20. Additionally, Balan testified that when she was showing Unit 4 to another potential buyer after Plaintiffs' application was rejected, Rojo appeared and began

spraying Lysol on Balan, the potential purchaser, and his broker. *See* Ex. E at 102:18-103:3-5. ("[A]ll of a sudden she started spraying Lysol all over the place. We had to go through this huge cloud of Lysol that was getting into our eyes, it was horrible. Why would you start spraying while people are walking by? . . . It almost felt like an assault."). The prospective buyer Rojo attempted to disinfect with Lysol was Asian. *Id.* at 103:13-16.

Together, the ample record evidence of substantive and procedural irregularities, along with direct evidence of discriminatory animus, more than suffices to raise an inference of discrimination. Because that is all that is required for Plaintiffs' claims to reach a jury, Defendants' motion should be denied. *Cronin*, 46 F.3d at 203.

**B.      Defendants Have Not Shown a Legitimate, Non-discriminatory Reason for Plaintiffs' Rejection**

Defendants' insistence that they rejected Plaintiffs' application because it was incomplete and inaccurate is contrary to the evidence.

Under step two of *McDonnell Douglas*, the Court must assess the genuineness of Defendants' asserted non-discriminatory rationale based on whether it guided their decision *at the time*. Defendants cannot prevail by "offering a legitimate and sufficient reason for [their] decision if that reason did not motivate [them] at the time of the decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 52 (1989); *see also Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir. 1990) ("a defendant may not invent a post hoc rationalization for its actions at the rebuttal stage of the case"). Here, Defendants support their purported rationale with (1) random news articles and state court legal analysis—both of which are irrelevant to this case, and (2) facts that are either false and/or learned in discovery, such that they could not have possibly motivated the rejection. Because Defendants have failed to assert a legitimate, non-discriminatory rationale that actually motivated Plaintiffs' rejection, summary judgment should be denied.

First, relying on news articles and state court cases that have nothing to do with discrimination, Defendants mistakenly argue that the "business judgment rule" is a complete defense to Plaintiffs' claims because a co-op Board has broad authority to make decisions about its management. Br. at 6-8. The business judgment rule, which directs courts to defer to corporate decisions made "in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes," does not apply to discrimination claims. *Fletcher v. Dakota*, 99 A.D.3d 43, 48 (1st Dep't 2012) ("[D]ecision making tainted by discriminatory considerations is not protected by the business judgment rule."); *Maun v. Edgemont Tarrytown Condo.*, 156 A.D.3d 873, 874 (2d Dep't 2017) ("Contrary to the defendants' contention, they are not entitled to the protection of the business judgment rule with respect to the causes of action alleging violations of [anti-discrimination laws].". The cases cited by Defendants all arose under circumstances where discrimination was not at issue. They are irrelevant to the Court's analysis under *McDonnell Douglas*.

Second, Defendants nitpick details of Plaintiffs' application to claim that it was either incomplete or inconsistent, but a close examination shows that it was neither. For example, Defendants claim that Plaintiffs' application "failed to include their 2017 W2s and 1099s and K1s for 2017-2019." Br. at 8. But Plaintiffs included their tax returns for 2017 and 2018, which fully disclosed their income. Exs. 17, 60. That they did not *separately* include certain underlying forms cannot be a legitimate basis for rejecting them, because Sarmiento did the same thing when he applied and no one batted an eye. Ex. 28 at DEFS8618-22 (2014 tax return submitted with purchase application, omitting information returns). With respect to 2019, Plaintiffs submitted all of the tax materials they had in their possession at the time of the February 2020 deadline. In any event, had Defendants seriously intended to consider Plaintiffs' application on its merits, they could simply have asked for whatever documents

20

they believed were missing. Instead, they communicated through their counsel that Plaintiffs' November 2019 application was "fine" and the only required supplementation was the addition of the disclosure affidavits and 2019 income documentation. Ex. E at 90:2-13.

Next, Defendants claim that Plaintiffs "failed to provide Privitera's student loan account statements or their Home Depot loan statements." Br. at 8. But Plaintiffs disclosed the existence of student loans. They list "Student Loan Deduction" *twice* on their application. Ex. 17 at DEFS716, 727. As Xia testified, Plaintiffs "do not receive a monthly statement" with respect to those loans, so there were no statements to include. Ex. I at 156:5-8. The application does not specifically seek student loan documentation, Ex. RR, and Defendants never asked Plaintiff for more information about the loans. Ex. I at 256:23-157:5. Likewise, Defendants offer no evidence that Plaintiffs possessed and failed to provide Home Depot loan statements—or that Plaintiffs even had any Home Depot debt (which they did not at the time of their November 2019 application). Defendants never asked Plaintiff about any Home Depot loan during their application process (or during discovery for that matter). It strains credulity to suggest that Defendants would have rejected Plaintiffs for failing to provide student loan statements when they did not even ask for them. The evidence does not support these "omissions" as a rational basis for Plaintiffs' rejection.

In addition, Defendants falsely claim that Plaintiffs' application was rejected for inconsistencies and "red flags"—namely, their supposed failure to disclose having owned a house in California and their former Harlem Condo. Plaintiffs disclosed the sale of a California home on their 2017 tax return, as it was sold in December 2017. Ex. 17 at DEFS848. Defendants cite no evidence that this transaction caused them any concern at the time they were reviewing Plaintiffs' application. *See* Ex. FFF (Sale Committee meeting notes omitting any mention of California home). Their citation to an affidavit by counsel is

21

insufficient to establish that the California house had anything to do with Plaintiffs' rejection. *Beyah*, 789 F.2d at 989-90.

Similarly, Plaintiffs disclosed the sale of their Harlem condo on their 2018 tax return, as it was sold in February 2018. Ex. 17 at DEFS824. Although Defendants claim that they were concerned that Plaintiffs either maintained their primary residence in Harlem or failed to disclose rental income on their application, neither is true. Plaintiffs moved out of the Harlem condo in the summer of 2015 and sold it in 2018. Although Plaintiffs testified that a renter occupied the Harlem condo at some point after Plaintiffs moved out, defense counsel failed to ask *when* the renter resided there. *See* Ex. I at 22:3-23:23. Had they asked, they would have learned that the renter lived in the Harlem condo prior to 2017. That rental income thus would not have been included as part of Plaintiffs' finances for 2017 and 2018 or disclosed as rental income on their financial worksheet. Defendants certainly have not shown that Plaintiffs failed to disclose anything, let alone that this was a contemporaneous reason for their rejection.

Defendants' contention that they "determined that Plaintiffs failed to meet the income caps for 2017 and 2018," Br. at 10, is equally unavailing. As discussed *supra* § II.A.2, Defendants' contortion of the income definitions and requirements to justify Plaintiffs' rejection *strengthens* their discrimination claim. Plaintiffs' reported AGI was below the applicable income cap for every year of the application's look-back period. That Defendants somehow managed to find otherwise does not give rise to a *legitimate* rationale for their rejection. Defendants' contradictory deposition testimony further belies their claim to have based the rejection on the income caps. Elbert testified that the Sales Committee "couldn't make [a] determination" whether Plaintiffs were financially eligible. Ex. G (Elbert Dep.) 203:5-12. By contrast, Sarmiento and Rojo testified that the Sales Committee *did* make such a determination. Ex. R (Sarmiento Dep.) 204:14-20; Ex. L; (Rojo Dep.) 37:8-12. The

minutes of the relevant Sales Committee meeting do not mention income caps at all. Ex. FFF. These contradictions raise fact questions about the genuineness of Defendants' belatedly stated concern.

Next, Defendants incorrectly claim that Plaintiffs "misrepresented" their projected monthly expenses because they "failed to mention" monthly student loan payments, Home Depot payments, and cash withdrawals made to pay their children's' nanny. But these expenses were disclosed throughout Plaintiffs' application; that is how Defendants learned about them. Defendants' claim that each expense should have been detailed in an exhaustive laundry list is belied by the instructions on their own financial statement, which merely required Plaintiffs to identify specific categories of expenses (maintenance, apartment financing, other mortgages, bank loans, auto loans, and "other") and calculate a "combined total." Ex. 17 at DEFS738. That is just what Plaintiffs did.

Finally, Defendants claim that the rejection was justified because they "were unable to determine whether Plaintiffs' 2019 and 2020 income met the relevant caps." Br. at 10. But as Sarmiento testified as the Board's 30(b)(6) witness on the issue of financial qualification, applicants were only required to provide financial documentation for "the two years prior to the year of application." Ex. R at 54:18-55:4. Plaintiffs applied in 2019. They provided their full financial documentation for 2017 and 2018, as required. Exs. 17, 60. At the time that they submitted their third application in February 2020, they did not have their full financial information for 2019 because tax returns are not due until April. Likewise, they did not have their full financial information for 2020 because only two months of the year had elapsed, but they still submitted employment letters stating their incomes for that year. Ex. 60.

Even if any of Defendants' so-called concerns were legitimate, which they were not, their claims that these issues motivated the rejection are not credible. If Defendants had any

questions or concerns about any aspect of Plaintiffs' application, they could have simply asked Plaintiffs. They did not do so. Ex. R 198:5-12. Balan testified that Defendants *never* expressed concern about Plaintiffs' income eligibility or financial qualifications to Plaintiffs throughout the entire application process. Ex. E 96:12-24. Xia testified that she "did not receive any requests or clarification on if any documents that I submitted were incomplete . . . . I did not receive communications of any kind that anything was missing from the Board." Ex. I at 156:23-157:5.

It is also telling that Defendants emailed the Urban Homestead Assistance Program (UHAB), a non-profit organization that provides support to HDFCs, *after* rejecting Plaintiffs to ask about the income eligibility requirements applicable to Plaintiffs. Ex. 54. (They were informed that Plaintiffs only needed to satisfy the cap as of 2019, the year they applied. *Id.*) A jury could reasonably find that if Plaintiffs' eligibility had been the sole basis for the rejection, the Board would have sought to learn the applicable financial requirements *before* rejecting them.

## CONCLUSION

As the Second Circuit has cautioned, summary judgment is a "drastic" remedy "in a discrimination case, because the [defendant]'s intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). That drastic remedy is unwarranted here. The motion should be denied and this matter set for trial.

Dated: November 18, 2022
New York, New York

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

/s/ David A. Lebowitz
David A. Lebowitz
Alanna Kaufman

18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332

*Attorneys for Plaintiffs*

25