UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA XIA and PAUL PRIVITERA,

                              Plaintiffs,

            – *against* –

65 WEST 87TH STREET HOUSING
DEVELOPMENT FUND
CORPORATION, CHRISTINE
ELBERT, SAMANTHA PINKOWITZ,
ANTHONY SARMIENTO, *and*
ANGELA ROJO,

                              Defendants.

**OPINION & ORDER**

20-cv-3576 (ER)

RAMOS, D.J.:

        Eva Xia and Paul Privitera, a married couple, claim that members of the Board of
Directors of a building located at 65 West 87th Street discriminated against them by
denying their application to purchase an apartment in the building due to Xia's protected
status as an Asian-American.  They raise claims under the Fair Housing Act, the Civil
Rights Act of 1866, New York State Human Rights Law, and the New York City Human
Rights Law.  Defendants move for summary judgment.  For the reasons set forth below,
the motion for summary judgment is DENIED.

I.      **BACKGROUND**

        The facts underlying this action are discussed in the Court's November 30, 2021,
Opinion and Order denying Defendants' motions to dismiss the complaint.  *Xia v. 65 W.
87th St. Hous. Dev. Fund Corp.,* No. 20 Civ. 03576 (ER), 2020 WL 7230961 (S.D.N.Y.
Dec. 8, 2020).  The facts are largely reproduced here, and they are supplemented by
additional evidence obtained through discovery.

### A. The Parties

Eva Xia, a Chinese American woman, and her husband, Paul Privitera, a white man, began their search for a Manhattan home to purchase in mid-2019.[1]  The couple had two children at the time of the first application.  In June 2019, they learned that Unit 4 of 65 West 87th Street (the "Building") was for sale by Orlando Rymer, the owner of the unit.  The unit was for sale at a below-market price because the Building was owned by a New York Housing Development Fund Corporation ("HDFC").  The Building is a five-unit, self-managed HDFC.

An HDFC is a type of cooperative, or coop,[2] that provides affordable housing to individuals with qualifying incomes.  In exchange for limiting the income of eligible tenants to 165% of Area Median Income ("AMI"),[3] an HDFC receives reduced real estate taxes and financial assistance from New York City's Department of Housing Preservation & Development.  Because prospective buyers are required to meet these income requirements, the seller of a unit in a building owned by an HDFC must refer a buyer to the Board of Directors for approval before a sale can be finalized.  The tenants of an HDFC are both its shareholders and members of its Board of Directors.  Defendants Christine Elbert, Anthony Sarmiento, and Angela Rojo are Coop shareholders of the Building, residents, and the Board members who reviewed and rejected Plaintiffs' applications.

The Building's Certificate of Incorporation states that the Building will provide housing for persons or families who earn "no more than 165% of the median income" of

---

[1] Unless otherwise noted, all facts in Section I are taken from the Complaint, Doc. 1, and the parties' Rule 56.1 Statements and Counterstatements.  Docs. 138, 146, 151.

[2] Owners of coop apartments are both shareholders in and tenants of the same apartment corporation.  New York Attorney General, *Cooperatives*, https://ag ny.gov/real-estate-finance-bureau/cooperatives. (last visited March 29, 2023).

[3] Area Median Income is the median income for a specific city, as defined each year by the United States Department of Housing and Urban Development ("HUD").  *See* NYC HPD, *Affordable Housing:  Area Median Income*, https://www.nyc.gov/site/hpd/services-and-information/area-median-income.page. (last visited March 26, 2023).

the statistical area "as determined from time to time by [HUD]."  Doc. 134-1 at 5.  For the relevant years, the income caps for Plaintiffs in New York City were as follows: $141,735 for 2017; $154,935 for 2018; $176,055 for 2019; and $187,605 for 2020.[4]

The Certificate of Incorporation does not specify how the Board will determine the income of an applicant, the application simply asks for "adjusted gross income as reflected in your federal tax return," without specifying which year's cap the adjusted gross income ("AGI") will be compared to.  Doc. 134-50 at 11.  Defendants represent that the procedure the Board utilized to assess whether an applicant meets the income cap was comparing the income on applicants' last two years of tax returns, along with the family size, to the AMI chart.  For example, if applying in 2019, like Plaintiffs did, the Board would look at the income caps for 2017, 2018, and 2019 to assess eligibility.

### B. The Initial Offer

Xia and Privitera attended an open house for Unit 4 on June 23, 2019.  At that time, they spoke with Rymer's real estate broker, Sandra Balan, who was employed by Brown Harris Stevens.[5]  Balan indicated that in order to apply for the apartment Plaintiffs were required to submit an offer form, a financial statement, and their two most recent tax returns, which were for 2017 and 2018 at the time.  The couple submitted both an offer on the Unit and the required income verification information that day.  The income verification information included two IRS Tax Return Transcripts and the couple's 2017 and 2018 tax returns.  Balan performed a preliminary review of the Plaintiffs' application and determined that they would likely qualify to purchase the unit.  She forwarded the offer and application to Rymer, who accepted the offer on June 26, 2019.

---

[4] In 2017 Plaintiffs had one child.  Plaintiffs' second child was born in 2019.

[5] Balan is the mother of Samantha Pinkowitz, a formerly named defendant, who was also a shareholder in the building but who did not participate in the review of Plaintiffs' application.  Pinkowitz was also employed as a real estate broker by Brown Harris Stevens, as Balan's assistant.

### C.  Due Diligence and the August 2019 Application

The approval process began on June 28, 2019, when Balan provided Xia and Privitera the Building's by-laws and proprietary lease.  The couple's lawyer, Justin Waiser, emailed the Board on July 9, 2019 asking for further relevant information such as the amount of the flip tax, maintenance fees, impending improvements to the building, history of complaints in the Unit, any pending litigation, and financing.  Doc. 134-29 at 6.  Elbert responded to the inquiries the same day.  On July 10, Waiser formally introduced the Board to his clients, writing, "The other person on the email was my client Eva Xia.  She and her husband are my clients…."  *Id.* at 4.  Waiser made an additional request for information about financing and insurance on July 11.  *Id.*  On July 12, Elbert asked Waiser for the completion of a "Due Diligence Form" and the payment of the accompanying $250 fee to continue the due diligence process.  *Id.* at 3.  There was no due date given for this form or payment.  Elbert sent this email only to Waiser; she did not copy either Xia or Privitera.  In response, Waiser asserted that he did not have any other questions "other than finding out what percentage of financing the building allows" and that "at this point [Plaintiffs] would not need to fill out the questionnaire."  *Id.* 2–3.  Again, on July 15 Waiser asked for more information about the Building, this time asking for a copy of the Building's insurance policy.  On July 16, 2019, the Board repeated its request for the Due Diligence Form and fee without addressing Waiser's additional questions.

As the approval process continued, Xia and Privitera entered into a contract with Rymer on July 18, 2019 to purchase the Unit for $900,000 in cash, with a $90,000 deposit.  The purchase price was equal to or above the sale price of recent apartment sales in the building, which were also purchased with cash.  The contract required confirmation

that the purchaser had examined the "Lease, the Corporation's Certificate of Corporation, By-laws, House Rules," and the most recent financial information related to the corporation.  The contract was contingent on approval by the Board.

The next day, July 19, Balan emailed Xia and Privitera a copy of the HDFC's 2016 purchase application.  This same application had been approved for use in connection with the most recent purchase of a Unit in 2016, however, Balan had not obtained the copy of the application from the Board.

### D.  The Special Committee and Revised Application

Upon learning that the 2016 purchase application was sent to Plaintiffs without Board approval, Elbert initiated a special sales committee via email to Sarmiento and Rojo on July 29, 2019.  Sarmiento and Rojo were "the only 'non-conflicted' board members" because Rymer was the seller and Pinkowitz's mother and employer was acting as the broker.  Indeed, in a Brown Harris Stevens listing for Unit 4 dated June 26, 2019, Balan and Pinkowitz were both listed as the brokers.  Additionally, on June 19, 2019, Xia sent an inquiry asking about the flip tax of the Unit via the StreetEasy real estate platform, and Pinkowitz responded.  Balan was copied on this email.

Elbert informed Sarmiento and Rojo, in relevant part, that:  (1) Waiser had to be told repeatedly to submit the due diligence form and fee; (2) the buyers were given the 2016 version of the application without Board approval; (3) due to Waiser's "refusal" to pay the required due diligence fee, Elbert wanted to incorporate the fee into the purchase application; (4) the Board had the ability to put the sale on hold; (5) there was a need to remove Rymer and Pinkowitz from the Board until the sale for Unit 4 closed due to their

interest in the sale;[6] (6) the best course of action was either a special sale committee comprised of non-interested board members or removing Rymer and Pinkowitz by a vote of a regular or special board meeting; and (7) the revised application should include an increase in the application fee, require a due diligence fee, revise the credit/criminal background check process to ensure compliance with any new legislation, require any buyer to prove the sale of their then current property and proof of primary residence, and require a disclosure of conflict of interest and affiliation.  *See* July 30, 2019 email, Doc. 134-35 at 3–5.

On July 30, 2019, Balan sent an email to the Board informing them that the contract for Unit 4 had been signed and noting it had been brought to her attention that the application sent to Plaintiffs was under review and may have a few revisions."  Doc. 145-29 at 3.  This was confirmed by the special committee on August 7, 2019.  *Id* at 2.

After a few email exchanges amongst Elbert, Sarmiento, and Rojo, on August 2, the group scheduled a special board meeting for August 4 at noon, but did not inform Pinkowitz or Eliana Pena,[7] until the day before at 1:22 p.m.; less than 24 hours' notice.  *See* "Special Board Meeting Tomorrow" email, Doc. 145-4.  The relevant by-law states that "special meetings … may be called… on one day notice."  Doc. 145-33 at 10.

The only attendees at the special board meeting were Elbert, Sarmiento, and Rojo, who established themselves as a special committee "without a conflict of interest… to

---

[6] In a July 29 email Elbert stated that Pinkowitz had information she should not have known and concluded that there is "proof of an ongoing conflict of interest."  Doc. 134-35 at 3.

[7] Pena typically acted as a proxy on the Board for her brother Rymer, who was the seller of Unit 4.  Doc. 144 at 6 n.2.

deal with the sale of Unit #4."  *See* August 4, 2019 Minutes of Board Meeting, Doc. 145-5.

On August 22, 2019, Plaintiffs submitted the application to Balan, which was the 2016 version that Plaintiffs had been provided.  However, since by July 30, 2019, Balan was aware that the application was being revised, she did not submit this application to the Board.  Balan Dep. 135:23–25.  On August 29, 2019, Rymer sent an email to the special committee asking why the application was being revised at this time and noting that a delay may cause him to lose the sale.  Doc. 145-6 at 3.  Rojo replied to only the special committee members saying "I don't know if we want this kind of neighbor already (supposedly) pressing."  *Id.* at 2.  The special committee replied to Rymer stating that the sale of an apartment can be a lengthy process and that based on Plaintiffs' failure to pay the $250 due diligence fee, Plaintiffs "may not be a good fit for the building."  Doc. 134-42 at 4–5.

It was only on September 5, after the August 29 email the special committee sent to Rymer, that Xia and Privitera learned about the required $250 fee and due diligence form from Waiser.  Plaintiffs submitted the payment to the Board on September 8, writing an apology for the miscommunication and stating that they "would have submitted the payment immediately" if they had known about it.  After receiving the apology, Rojo wrote an email to the special committee saying "sorry to say I'm not feeling it."  Doc. 134-42 at 4.  The Due Diligence form was submitted to the Board the next day, on September 9, 2019.  Doc. 134-43.  In another email to the special committee sent on September 11, 2019, Rojo said

> After reading and really thinking forward with an open fair mind- the present situation with [Pinkowitz/Balan] … and this lawyer involvement in

the sale of unit 4- I must admit [at] this point I'm extremely very uncomfortable and not satisfied with any of them and I'm thinking we should reject the applicant.

Doc. 145-8 at 2.

On September 27, 2019, the special committee sent Balan the revised application. Doc. 134-48 at 2.  The revised application required approximately $12,000 more in fees and deposits than the 2016 application form, including a $500 application fee (increased from $350), a $1,000 financing fee (increased from $300), a new $250 Due Diligence fee,[8] a new $10,000 refundable primary residence guarantee deposit, and a new $1,000 refundable insurance guarantee fee.[9]  *See* 2019 Application form, Doc. 134-50 at 4. Balan testified that she found these fees to be "astronomically high" and unlike anything she has ever seen in a HDFC coop.  Balan Dep. 56:24–57:9.

It also required several new or revised components:  (1) a completed due diligence application; (2) clear and legible copies of photo identification for all parties to the sale (including all purchasers, sellers, brokers, and attorneys) and all proposed occupants of the apartment; (3) completed financial statement *as of the most current month end* (new specification); (4) the past *three* (revised from two) months of statements (bank, brokerage, retirement accounts, etc.) supporting each asset and each liability claimed on the financial statement and all supporting statements; (5) data verification and background check authorization form; (6) Smoking Policy form; (7) and a conflict of interest disclosure statement, which included:

---

[8] Because Plaintiffs already paid the Due Diligence fee, they did not need to pay it again with submission of the November 19 application.  *See* November 18, 2019 email from special committee, Doc. 134-52 at 2.

[9] The credit/background check fee was reduced from $108.63 per person to $40 per person, for a net increase in fees is $11,962.74.

- Copies of all signed contracts between the parties (in this case, that included the contract of sale, the contract between Rymer and Balan, the contract between Rymer and his attorney, Murrey Targownik,[10] and the contract between Plaintiffs and their attorney Waiser);

- A declaration of affiliation of professional or personal relationship between all parties in the form of a table;

- A signature affirmation of each party; and

- Copies of photo identification of all the attorneys and brokers involved in the sale.

*See* Blackline of 2016 and 2019 application, Doc. 134-49; *see also* 2019 Application form, Doc. 134-50 at 45.[11]

### E.  The November 2019 Application

Plaintiffs submitted the revised application to the Board on November 19, 2019. Despite approximately $12,000 in fees, the special committee consented to Plaintiffs' request to pay only the $500 application fee and the $40 credit/background check fee with their application and for the remainder of the fees to be due at closing.  Doc. 134-52 at 2.

---

[10] Murrey Targownik is Sandra Balan's husband and Samantha Pinkowitz's stepfather.

[11] The components of the application that remained the same are:  contract of sale; fee agreement for purchaser and seller; apartment usage affirmation; basic information form; sales application worksheet; purchase application; copies of each applicant's two most recently filed complete and signed Federal Income Tax Returns, inclusive of all W-2/1099 statements and all schedules; completed copy of Form 4506-T (Request for Transcript of Tax Return) for each applicant's two most recently filed Federal Income Tax Returns; four recent and consecutive pay stubs for each applicant; three personal reference letters for each applicant; two professional/business reference letters for each applicant; two financial reference letters for each applicant; reference letter from a landlord/managing agent speaking to monthly charges, length of occupancy, and whether or not applicant is in good standing/has been an ideal tenant; proof of ownership of any homes or residential properties applicant currently owns and a statement about the applicant's plans for that residence; employment verification letter for each applicant; pet rules and regulations; and the statement of interest.

The application included a photo of Xia and her family, and the cover letter mentioned that Xia was born in China.  Of the required documents, Plaintiffs failed to provide or incorrectly submitted the following:

- Photo identification for seller and buyer attorney.

- In the purchase application section:  Plaintiffs failed to list the lot of land they owned in California the preceding three years.  Xia Dep. 29:5–17.  This lot was sold on December 27, 2017.  *See* 2019 Application Doc. 134-5 at 35.

- In the completed financial statement section:  Plaintiffs failed to list health saving account assets, student loan and Home Depot liabilities, and projected monthly expenses (student loan payments, maintenance for current co-op, Home Depot debt, $640-780 weekly for child care).  Additionally, the completed financial statement was dated July 31, 2019 and the amount in the statements did not correspond to that date.  Nothing was provided as of October 31, which was the most current month end from the November 19 submission.

- In the past three months of statements section of the application:  the data provided was from July–September, despite a submission date of November 2019, thus the October information was missing; all Ally Bank, Schwab, and 529 savings account statements were missing; "some" of the Marcus by Goldman Sachs, retirement fund, and mortgage statements were missing; there were no Home Depot debt or student loan debt statements provided.[12]

- In the Federal Income Tax Returns section:  W2s for 2017 were missing, as well as the 1099s for 2017 and 2018.

- In the personal reference letters section:  instead of receiving three letters per applicant, there were three letters submitted on behalf of both Xia and Privitera and one for Xia.

- In the financial reference letters section:  instead of receiving two letters per applicant, there were two letters total, one letter submitted on behalf of both Xia and Privitera and one for Xia.

- In the conflict of interest disclosure statement section:  Rymer's attorney and broker, and Plaintiffs' attorney refused to provide their respective

---

[12] Plaintiffs argue that because they did not receive monthly statements for these two expenses, they were unable to submit those documents with their application.  *See* Plaintiffs' Opp., Doc. 144 at 25.

> contracts; the attorneys did not sign the affirmation, and the nature of
> "familial" relationships indicated in the table were not explained (e.g.,
> how exactly different parties were related to one another).

*See* Unit 4 Purchase Application Review, Doc. 134-12; *see also* 2019 Application, Docs.

134-3, 134-4, 134-5, 134-6.

The application specified that the couple was living in an HDFC in Midtown they

had owned since December 2014, and that before that, from May 2013 until December

2014, they lived in a Harlem condo they had owned.  Doc. 134-3 at 51–52, 58.  However,

in their 2018 tax return, Plaintiffs indicated that the Harlem condo was sold in February

2018, leaving a discrepancy of over three years of unreported information, such as

potential rental income.  *See* 2019 Application Doc. 134-5 at 7.

Plaintiffs' financial documents indicated that their AGI for 2017 and 2018 was

$174,955 and $136,242, respectively.  Docs. 134-5 at 28, 134-4 at 70.  The 2017 tax

return included capital gains from the sale of the property the couple owned in California.

Doc. 134-5 at 35.  The 2018 tax returns did not include the capital gains from the couple's

sale of the condo in Harlem in 2018, *id.* at 7, as Plaintiffs claimed a homestead

exemption.[13]  Defendants allege that the exemption was claimed "wrongfully" because

Plaintiffs had not resided in the Harlem condo for the minimum two-year period required

by the exemption.  Plaintiffs now claim that they lived in the Harlem condo from May

2013 until "summer 2015," thus meeting the 2-year residency and ownership

requirement.  *See* Plaintiffs' Opp., Doc. 144 at 20.

---

[13] In order to be eligible for this exemption, a tax payer must meet the ownership and residence requirements (owning the home for at least 24 months out of the last 5 years leading up to the date closing and having used it as their residence for at least 24 months of the previous 5 years).  *See* 26 U.S.C. § 121; *see also* IRS, *Topic No. 701 Sale of Your Home,* https://www.irs.gov/taxtopics/tc701 (last updated Jan. 27, 2023).

The special committee agreed, via email, to have the Building's attorney, Shapiro, conduct an initial review of the November 2019 application, checking for compliance with income caps and tax disclosures, as well as general completeness. Doc. 145-20. However, before receiving Shapiro's report, Elbert sent an email to Sarmiento and Rojo stating that she "took a peak [*sic*]" and was "ready to reject the application." Doc. 145-11 at 2. She also stated "of course we will wait for [Shapiro's] decision" and that perhaps inviting the applicants to reapply with different brokers/attorneys, or with full discourse could be a path forward. *Id.* Elbert expressed concern about the lack of broker contract and said she "know[s] for a fact that Pinkowitz was originally a co-broker." *Id.* Rojo, without having reviewed the application, and before Shapiro had submitted her report, responded that she does not do well with dishonest people and that her "vote is to reject the application." *Id.; see also* Rojo Dep. 164:2–166:19.

The special committee conducted a review of the submission and noted concerns about the frequency with which Plaintiffs sold property (the California lot in 2017 and the Harlem condo in 2018). Other aspects of the 2019 application that concerned the special committee were that the gains from the sale of the Harlem condo were reported as non-taxable, the potential IRS audit implications if the sale of the Harlem condo were indeed taxable, and possible unreported income from the rental of the Harlem condo after Plaintiffs moved. The application was deemed incomplete and rejected by the special committee.

Notably, the special committee never informed Balan or Plaintiffs what was deemed to be missing or incomplete from the November 2019 application. Elbert Dep. 181:8–182:6. Balan testified that in a meeting with Shapiro, Shapiro told her that the

November 2019 application "itself was fine," Plaintiffs were "income qualified to purchase" the Unit, and that they just needed to supplement the application with affidavits and W2s.  Balan Dep. 90:7–11, 91:15–20.

### F.  The February 2020 Application and Rejection

Balan emailed Xia and Privitera on January 8, 2020, advising them of additional requirements that Shapiro said that the application now required.  According to Balan, Plaintiffs were now required to submit notarized affidavits stating they had no conflicts in the transaction.  The special committee also required that the Plaintiffs submit another application package with updated financial information.  The couple began filling out the application form over the next month.

The parties dispute whether Defendants required affidavits with the February 2020 submission, or whether Plaintiffs volunteered the affidavits.  Doc. 133 at 18.  On January 10, 2020, Elbert sent an email to the special committee expressing that they only "wanted 3 things:  completed application, completed broker agreement, and removal of seller attorney" and that she did not understand why Plaintiffs now "want to add all these affidavits, statements, substitutions, revisions, above and beyond those 3…."  *See* January 10, 2020 email, Doc. 134-57.  Although Balan requested edits on the affidavit forms on January 23, 2020, and was told Shapiro would provide them soon, Shapiro did not send them to Plaintiffs until February 2, 2020.  Doc. 134-58.  In a February 14 email, Balan informed Plaintiffs that the special committee had set February 17, a federal holiday, as the deadline for submission of all forms.  A deadline had never been imposed on any other buyers.  *See* Balan Dep. 93:9–21 (stating that in her 22 years of experience she never had a Board give her a deadline for when a package had to be submitted); *see also* Elbert Dep. 189:22–190:3 (stating that to her knowledge, the Board had never set a deadline for submission in any of the prior sales that she was involved in).

Xia and Privitera submitted their third application, and the second application to the special committee, on February 17, 2020.  Along with the same photo of Xia and her family, this application included eight separate signed affidavits,[14] a $90,000 cash deposit, and financial documents demonstrating their estimated total 2019 and 2020 AGI. The next day, after reviewing the Plaintiffs' application, Rojo emailed the special committee saying she was "baffle[d] with all that … B[ullshit] and garbage these people can write down on paper."  Doc. 145-12 at 5.

The financial documents reflected an AGI of $139,493 and $134,100 for 2019 and 2020, respectively.  At the time, Plaintiffs owned and lived in a HDFC in Midtown, which they indicated they planned on selling once their purchase of Unit 4 was approved.  Doc. 134-7 at 47.  Defendants argue that the income from the sale would place the Plaintiffs above the income cap for 2020.  Doc. 133 at 12.

The February application included all of the required financial documents, with the exception of (1) the 2017 W2s, (2) 1099s for 2017–2019, (3) K1s for 2017–2019, and (4) 3 months of statements from the Plaintiffs' Schwab brokerage account.  The February application was also missing the required photos and signature affirmation of Waiser and

---

[14] The affidavits were not filed as exhibits in this case, but according to the Complaint the special committee required (1) two affidavits from Plaintiffs swearing that they have no prior relationships to anyone involved in the sale or the Building, and that they have attached the retainer agreement with their attorney, and a copy of their attorney's photo ID; and swearing that the only agreement they had with Balan was a disclosure notice that she was Rymer's broker, and that the only agreement they had with Rymer was the purchase contract; (2) two affidavits from Rymer swearing that he would not use his attorney, Murrey Targownik, in this transaction or any other transaction at 65 W 87th St. HDFC, that he would not pay Targownik, and that he will proceed *pro se*; and swearing that he is resigning from the Board, that he has no relationship to Plaintiffs or Plaintiffs' attorney, and that he has attached the only agreement between him and Balan; (3) one affidavit from Waiser swearing that he has no prior relationships to anyone involved in the sale or the Building, and that Plaintiffs are now entering into an amendment to the contract of sale; (4) one affidavit from Targownik swearing that he is no longer the attorney for Rymer, and that Rymer will not pay him; (5) one affidavit from Balan swearing that she has no prior relationships with Plaintiffs or their attorney, and that she has attached her agreement with Rymer; and (6) one affidavit from Pinkowitz swearing that she has a direct conflict in this transaction, and that she has no prior relationships with Plaintiffs or Plaintiffs' attorney.  Doc. 1 ¶¶ 177–184; *see also* February 18, 2020 email from Elbert summarizing the affidavits, Doc. 134-10 at 59; *see also* Doc. 145-30 (Balan handwritten notes).

Targownik.[15]  Doc. 134-6 at 27.  In place of the signed contract between parties, Rymer's attorney, Targownik, and broker, Balan, both submitted a letter informing the special committee that they are unable to supply the contract because it was protected by attorney-client privilege.  *Id.* at 47, 49.  The Plaintiffs' attorney, Waiser, did the same.  *Id.* at 51.

The special committee met on February 26, 2020 to discuss the application, Doc. 134-64, and noted that, in addition to the missing financial documents discussed above, the application was missing student loan statements and the Home Depot consumer debt statements.  Additionally, the special committee raised concerns about:

- The use and occupancy of the Harlem condo;

- Income generated by the Harlem condo;

- The homestead exemption Plaintiffs claimed on their taxes regarding the Harlem condo;

- The purpose of recurring cash withdrawals averaging $680 per week;[16] and

- Contradictory claims in the conflict of interest affidavits.[17]

The special committee did not note any concerns about the income caps for 2017, 2018, 2019, or 2020 in the meeting notes, but argue in their briefs that Plaintiffs did not meet the income cap for 2017 or 2018, and that they could not determine whether the

---

[15] Instead of submitting a copy of their attorneys' photo identification, Plaintiffs included a page that stated "The attorney's will be happy to present their photo ID's to the board at closing" with their application. Doc. 134-3 at 32.

[16] Plaintiffs subsequently advised that these withdrawals were for their nanny's salary, whom they paid in cash.

[17] In an email sent to the special committee on February 18, 2020, Elbert characterizes the affidavits as "basically garbage," saying that Rymer and Balan "attest[] to things the board knows are false," and Xia and Privitera "attested to something they could not actually know."  Doc. 145-12 at 6.

income caps for 2019 and 2020 were met.  The special committee concluded that the application was incomplete, inadequate, and inconsistent and voted unanimously to reject the application.  The special committee transmitted the rejection on March 2, 2020 via Shapiro, but no reason was given.  Thereafter, Xia and Privitera wrote to the Board on multiple occasions, both through email and certified letters, but did not receive a response.  *See* March 11, 2020 email from Xia asking for reconsideration, Doc. 145-21 at 3–4.  As of the date of Plaintiffs' complaint on May 7, 2020, Unit 4 had yet to be sold.  In total, the special committee reviewed two of Plaintiffs' applications:  one submitted on November 19, 2019 and one submitted on February 17, 2020.  The first application, submitted to Balan on August 22, 2019, was never forwarded to the Board for review.

### G.  Post Rejection

After rejecting Plaintiffs' February 2020 application, the form of which had been revised in 2019, the Board again revised the application as follows:

- Copies of photo identification of all the attorneys and brokers involved in the sale were no longer required;

- Only two months of financial statements were now required, compared to three months in the 2019 application;

- The conflict of interest disclosure was no longer required; and

- The statement of interest was no longer required.

*See* 2020 Application, Doc. 145-16.

Additionally, there were a number of changes to the fees—with the application fee reverted to $350, the $250 due diligence fee removed, the $10,000 refundable primary

residence guarantee fee removed, and the $1,000 refundable insurance guarantee fee removed.[18] This represents a total decrease of approximately $11,400 in fees. *Id.*

On March 24, 2020, twenty-two days after rejecting Plaintiffs' second application, Elbert emailed the Urban Homestead Assistance Program (UHAB), a non-profit organization that provides support to HDFCs, to ask about the definition of "income" and the correct review period for evaluating purchasers to HDFCs. Doc. 145-27 at 3. The UHAB advised Elbert that the Board should use an applicant's most recent tax return to determine whether they are qualified to purchase in the Building.

### H. Experiences of Other Tenants

In support of their claims of anti-Asian bias, the Plaintiffs make several allegations regarding the experiences of other tenants with the Building's Board. They allege that Cindy Zhou, an Asian-American and former resident of the Coop, suffered discrimination by members of the Board. Zhou was Rojo's roommate and tenant in 2016 for approximately one year, before Rojo asked her to move out to make space for her niece. Rojo Dep. 93:16–94:6, 96:21–97:2. In 2017, Zhou moved into Rymer's apartment, which is directly below Rojo's apartment. Consequently, Zhou and Rojo had a falling out and Rojo felt hurt by the fact that neither Zhou nor Rymer informed her that Zhou was moving into the apartment downstairs. *Id.* 96:7–23, 195:6–10.

In Board emails, Zhou has been described as a "squatter" by Rojo and characterized – similarly to Plaintiffs – as "not a good fit" for the building. Rojo also stated that she did not "approve of [Zhou's] residence in our FAMILY oriented BrownStone [*sic*]" in a January 27, 2020 email to the Board. Doc. 145-13. In March 2020, Rojo also sent text messages to her neighbors raising concerns about Zhou's lack of hygiene, saying "the tenant living on the 4th floor… for sure doesn't clean[] disinfect[] healthy hygiene" and "does her shopping from Chinatown." Doc. 145-14 at 19.

---

[18] The credit/background check fee was reverted to $108.63 per person for a total net increase in fees of $11,537.26.

Plaintiffs submit that Rojo is referring to Zhou.  However, in her deposition, Rojo testified that she was "probably" referring to a different tenant on the fourth floor.  Rojo Dep. 204:21-206:8.

 According to Rymer, Rojo, who lived in the apartment above Rymer's, also persistently pounded on the floor when Zhou lived with Rymer.  *See* Amended Complaint in related case, *Rymer v. 65 West 87th HDFC et al.,* Doc. 134-70 ¶ 153.  Additionally, Elbert referred to Zhou as "Miss Asian" in a May 24, 2017 text message exchange with Rojo.  Doc. 145-15 at 2.  No person of Chinese or Asian descent has ever been approved to purchase an apartment in the building.  According to Plaintiffs, the only other buyers who have been rejected also consisted of a European husband and Asian wife.  *See* Rojo Dep. 62:2–68:20 (confirming that the applicants were rejected, that Rojo was involved in the sale, and that there was a note in the Board's communications about the applicant's father being in Taiwan).

Lastly, with respect to Asian-Americans, Balan testified that there was an incident in which "Rojo attempted to disinfect" a prospective Asian buyer with Lysol after she finished showing Unit 4 to another potential buyer.  As they were leaving, Rojo, who was in the lobby, began to spray Lysol.  Balan testified that  "it almost felt like an assault" and that "it was bizarre."  *See* Balan Dep. 102:18–103:5, 103:13–16.

In contrast to Plaintiffs' experience, all three of the purchases that preceded Plaintiffs' application closed in four months or less.  Defendant Sarmiento used the same application Plaintiffs originally submitted to Balan when he and his wife purchased Unit 1 in 2016.  He was interviewed by the Board within one month of signing the purchase contract and closed the sale within three months.  Moreover, during Sarmiento's application process, similar to Plaintiffs, he failed to separately include several underlying tax forms.  *See* Sarmiento Application, Doc. 145-17.  Unlike Plaintiffs, however, his application was accepted.  The sale of Unit 2 to Pinkowitz in 2015 took two months after contract-signing, and the sale of Unit 3 to Elbert took four months.

## I.   Procedural History

The Complaint was filed on May 7, 2020.  Doc. 1.  Pinkowitz was voluntarily dismissed on June 12, 2020.  Doc. 18.  A conference was held on July 7, 2020 in which Defendants were granted leave to file a motion to dismiss.  On July 28, 2020, Defendants moved to dismiss on grounds that Plaintiffs were not financially qualified applicants and did not allege facts that raised an inference of discrimination.  Doc. 27.

On December 8, 2020, the Court denied Defendants' motion, concluding that Plaintiffs' allegations, taken as true, did indicate a possibility of discrimination and therefore presented a plausible disparate treatment claim.  Doc. 62.  On February 8, 2021, Defendants filed an answer to the Complaint.  Doc. 72.  Discovery proceeded.

On July 22, 2021, during a pre-motion conference, the Court granted leave for Defendants to file a motion for summary judgment.  Between August 6 and October 22, 2021, there were a number of motions filed under seal regarding Pinkowitz's deposition. On December 1, 2021, the parties were directed to submit a joint proposed protocol for obtaining her testimony by December 17, and that protocol was approved.  Docs. 103–5. On April 20, 2022, the parties submitted another status report indicating that discovery was concluded.  Doc. 111.  On April 29, 2022, the parties informed the Court that they were pursuing private mediation.  Doc. 113.  The parties scheduled a private mediation on June 23, 2022, Doc. 115, but it was ultimately unsuccessful.  Doc. 118.  In light of this, the parties requested a briefing schedule for Defendants' motion for summary judgment, which the Court granted.  *Id.*; Doc. 119.  Defendants filed the instant motion on August 29, 2022.  Doc. 132.

## II.    LEGAL STANDARD

### A.  Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-

moving party." *Senno v. Elmsford Union Free Sch. Dist*., 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (*citing SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id*.  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr*., 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc*., 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp*., 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found*., 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

For claims under New York law, the Court should determine how the New York Court of Appeals would decide them.  *Reddington v. Staten Island Univ. Hosp*., 511 F.3d 126, 133 (2d Cir. 2007) (citation omitted).  Decisions from New York's intermediate

appellate courts are helpful indicators, but this Court is not bound by those decisions.  *Id.* (internal quotation marks and citations omitted).

### B.  *McDonnell Douglas*

Claims for disparate treatment under each of Plaintiffs' claims—the Fair Housing Act ("FHA"), §§1981 and 1982, NYSHRL, and NYCHRL— are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979); *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 588 n.5 (S.D.N.Y. 2012).

First, the plaintiff must establish a prima facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 9 (1973).  Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision.  *Id.*

If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual, and that discrimination was the real reason for the defendant's actions.  *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000).  The ultimate burden of persuading the trier of fact that the defendant discriminated always remains with the plaintiff.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (1999).  Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination.  *Schnabel v. Abramson*, 232 F.3d 83, 91.

## III.   DISCUSSION

Plaintiffs contend that Defendants rejected their application to purchase Unit 4 because Xia is Asian-American.  Defendants argue that their decision to reject the application had nothing to do with her national origin and that the decision was based on concerns raised by the couple's financial statements and incomplete and inconsistent applications.  Doc. 133 at 10–11.  Plaintiffs assert that this rationale is pretextual.

Defendants move for summary judgment on the grounds that Plaintiffs have failed to adduce evidence to prove that the special committee's reasons for rejecting their application were pretextual.

### A. Prima Facie Case

To make out a prima facie case, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she applied for and was qualified to rent or purchase the housing for which she applied; (3) that she was rejected; and (4) that said housing opportunity remained available. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Plaintiffs have established a prima facie case of discrimination: (1) Xia, a Chinese-American woman, is a member of a protected class; (2) Plaintiffs sought and were qualified to purchase the apartment;[19] (3) they were rejected; and (4) the apartment remained available thereafter. The Court notes that Defendants begin their argument at the second step of the analysis.

### B. Defendants' Proffered Nondiscriminatory Reasons

Once Plaintiff establishes a prima facie case of discrimination, the burden of production shifts to Defendant to introduce evidence that "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). The Defendants' burden is one of production, not persuasion. *Reeves* 530 U.S. at 142. However, under step two, Defendants cannot prevail by "offering a legitimate and sufficient reason for [their] decision if that reason did not motivate [them] at the time of the decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 52 (1989).

---

[19] Defendants do not argue that Plaintiffs were unqualified to purchase the Unit in response to Plaintiffs' prima facia case.

*1. Business Judgment Rule*

Defendants argue that under the business judgment rule they have a complete defense against a claim of discrimination because the submissions were "deficient and misleading," and the Coop therefore had a duty to reject the Plaintiffs' application. Doc. 133 at 12–13. Because coop boards are vested with the authority to determine who becomes a shareholder, Defendants argue, it is important to protect the shareholders from applicants who might negatively affect the financial profile of the building. *See Woo v. Irving Tenants Corp.*, 276 A.D.2d 380 (2000) (finding that the disputed actions of the cooperative in rejecting plaintiff as a purchaser of its shares were within the protective ambit of the business judgment rule); *see also Chapman v. 2 King St. Apartments Corp.,* 8 Misc. 3d 1026(A), 806 N.Y.S.2d 444 (Sup. Ct. 2005) ("Coops must worry about the future ability of their cooperators to pay maintenance, as their failure or delay to do so jeopardizes the entire enterprise."). Further, Defendants contend that this authority to reject applicants whose financial profiles do not meet a board's standards has been widely recognized by the courts. *See Fishman v. Charles H. Greenthal Mgmt. Corp.,* 82 A.D.3d 425, 426 (2011) (finding that the plaintiff failed to raise an inference that defendant cooperative corporation acted in bad faith in rejecting the prospective purchaser of plaintiff's shares in the coop for financial reasons); *see also* G*leckel v. 49 W. 12 Tenants Corp.*, 52 A.D.3d 469, 470 (2008) (finding that because the plaintiff failed to show that he was financially responsible, the rejection of the application reasonable).

In response, Plaintiffs first argue that the business judgment rule does not apply to discrimination claims. Indeed "arbitrary or malicious decision making, or decision-making tainted by discriminatory considerations is not protected by the business judgment rule." *Fletcher v. Dakota, Inc*., 99 A.D.3d 43 (2012); *see also Maun v.*

23

*Edgemont at Tarrytown Condo.*, 156 A.D.3d 873, 874 (2017) (finding that an unlawful discrimination claim is inherently incompatible with good faith and the exercise of honest judgment and therefore the business judgment rule is not applicable) (internal quotations omitted). The Court agrees that "further judicial scrutiny is triggered in instances of … unlawful discrimination" and that the business judgment rule does not apply as a defense in this matter. *Cannings v. E. Midtown Plaza Hous. Co.*, 941 N.Y.S.2d 536 (Sup. Ct. 2011), *aff'd*, 104 A.D.3d 443, 960 N.Y.S.2d 413 (2013).

### 2. *Plaintiffs' Applications Were Incomplete*

The record reflects that the applications were incomplete, as specific documents that were requested were not included. However, there is a dispute as to whether the information that Defendants claim was missing was otherwise incorporated into the application, and how the income cap should have been calculated. Nonetheless, Defendants meet their burden at the second stage of the *McDonnell* analysis by providing evidence that if "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr.,* 509 U.S. at 509.

### a. *Plaintiffs Failed to Provide Required Documents*

Defendants claim that the November 2019 application was "riddled with inconsistencies, misrepresentations, and red flags about its truthfulness." Doc. 133 at 10–11. First, Defendants allege that the November 2019 application omitted financial documents related to income, assets, and liabilities. As to income and assets, it is undisputed that the Plaintiffs' 2017 W2s and 1099s, K1s for 2017–2019, and statements for their Schwab brokerage account were not included. These missing documents are detailed in the special committee meeting notes dated February 26, 2020. *See* Doc. 134-

64 at 2.  The meeting notes also state that the application was "incomplete, inadequate, and inconsistent."  *Id.* at 3.  And as to liabilities, in response to Defendants' allegations that Plaintiffs failed to include the monthly student loan or Home Depot statements, Plaintiffs argue that there were no student loan or Home Depot statements to provide because they did not receive monthly statements for the charges.

### b.  *Plaintiffs Failed to Report Rental Income for the Harlem Condo*

As part of the November 2019 application, Plaintiffs were required to identify all residential ownership or interests within the last three years.  Doc. 134-3 at 56.  Plaintiffs failed to disclose two properties that they owned within three years preceding the application:  a lot of land in California and a condo in Harlem.  *See* Xia Dep. 29:5–17, 159:25–161:12 (Xia testifying she jointly owned a lot of land in Riverside, California and that she owned the Harlem condo within the last three years).  The record reflects that while Plaintiffs did not disclose the ownership of these two properties in the designated space of the application, they did report the proceeds of the sale of both properties, elsewhere, in their tax returns.  *See* Doc. 134-5 at 7, 35 (listing the sale of the California property on December 27, 2017, and the sale of the Harlem condo on February 6, 2018).

Moreover, Defendants point out that in the November 2019 application, Plaintiffs claimed to have moved out of the Harlem condo and into their current home, a Midtown HDFC, in December 2014, but provided no information as to the occupancy of the condo between then and the sale of the condo, in February 2018.  Doc. 134-3 at 58; Doc. 134-5 at 7.  The Court notes that while there was no explicit question about rental income in the application, there were several places to list "other" income.  *See* 2019 Application form, Doc. 134-50 at 19, 30.  Indeed, in their November 2019 application Plaintiffs included an addendum in which they include "other income" for 2017 and 2018.  Doc. 134-3 at 43.  Plaintiffs did not include any rental income on this addendum or elsewhere in the November 2019 application.

During discovery Plaintiffs admitted that they rented the Harlem condo.  *See* Xia Dep. 22:3–10 (Xia testifying they had one renter in the Harlem condo between the date the couple moved out and the date the condo was sold); *see also* Privitera Dep. 14:7–23 (Privitera testifying that after he moved out, but before the Harlem condo was sold he "rented out the apartment to somebody").  According to Defendants, the failure to disclose this information prevented them from calculating whether Plaintiffs met the income cap because of the rental income Plaintiffs received.

    *c.  Plaintiffs Failed to Disclose Monthly Expenses*

Additionally, Defendants allege that Plaintiffs misrepresented their projected monthly expenses by failing to mention their monthly student loan payments ($422), their Home Depot monthly payments ($130), and approximately $2,700 in nanny payments.[20] *See* 2019 Application, Doc. 134-3 at 65 (listing only maintenance and other mortgages as projected month expenses).  Defendants argue that omitting "several thousands dollars of expenses per month" is grounds alone to merit the rejection of the application.

    *d.  Income Caps*

Defendants argue that they determined that Plaintiffs failed to meet the income caps for 2017 and 2018.  Doc. 133 at 11.  It is undisputed that Plaintiffs' 2017 AGI, as reported on their tax returns, was well above the 2017 cap.  *See* Doc. 134-9 at 18 (Plaintiffs' 2017 tax returns reflecting an AGI of $174,955).  For 2018, Defendants allege that despite Plaintiffs' tax returns reflecting an AGI below the cap, that figure is inaccurate because Plaintiffs excluded the profit from the sale of their Harlem condo by wrongfully claiming a homestead exemption.  *See* Doc. 134-5 at 7 (listing the Harlem condo as selling for a profit of $285,008).  Defendants allege that Plaintiffs were not

---

[20] *See* Xia Dep. 91:24–93:22 (Xia stating she employed a nanny at the time when she submitted the purchase application and that she paid the nanny in cash).

entitled to take this exemption because they had not resided in the Harlem condo for the minimum two-year period of the preceding five years required by the homestead exemption.  *See* Doc. 134-3 at 58–9 (Plaintiffs' 2019 application noting the dates of occupancy for the Harlem condo as May 1, 2013 to December 17, 2014).  Thus, Defendants allege that taken altogether, Plaintiffs' income was $423,462, well above the 2018 cap of $154,935.  Plaintiffs now claim that they lived in the Harlem condo from May 2013 until "summer 2015," thus meeting the 2-year residency and ownership requirement of the applicable tax regulation, 26 U.S.C. § 121(a).  Doc. 144 at 20.

Lastly, the Defendants allege that they were unable to determine whether Plaintiffs' 2019 and 2020 income met the relevant caps.  Defendants assert that Plaintiffs failed to provide the required 1099 and K1 forms.  *See* Doc. 134-64 (Special Committee Meeting notes from February 26, 2020 detailing missing required financial info:  1099s for 2019 and K-1s for 2019).  For 2020, Defendants estimated that Plaintiffs would be making a profit from the sale of their HDFC in Midtown.  *See* Doc. 134-7 at 47 (Plaintiffs representing they "will put [their] current residence up for sale" once they are approved to purchase at 65 West 87th St.).  Defendants argue that Plaintiffs would have collected approximately $55,000 in profit from the sale bringing their 2020 expected income to $189,000.  *See* Def's Motion for Summary Judgment, Doc. 133 at 12.  This would have been higher than the $187,605 income cap for a family of four in 2020.  Doc. 134-20 at 9.

The Court finds that Defendants have satisfied their burden of articulating non-discriminatory reasons for denying Plaintiffs' application.  That the applications were not completely or correctly filled out, in a manner that raised concerns about the Plaintiffs' financial eligibility, is a legitimate reason to reject an application.

### C. Pretext

Because Defendants have articulated legitimate, non-discriminatory reasons for their decision to reject Plaintiffs' application, the burden now shifts back to the Plaintiffs, who bear the ultimate burden of demonstrating that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, Plaintiffs are not required to show that the Defendants' proffered reasons were false or played no role in the decision, but only that they were not the only reasons and that a prohibited factor was at least one of the "motivating" factors. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

Plaintiffs must identify disputed material facts which, if resolved in their favor, would enable a factfinder to find that Defendants' articulated basis for denying their application was a pretext for discriminatory action. *See De La Fuente v. Sherry Netherland, Inc.*, No. 17 Civ. 4759 (PAE), 2019 WL 3430207, at *14 (S.D.N.Y. July 30, 2019), *aff'd*, 845 F. App'x 29 (2d Cir. 2021).

In response to the Defendants' proffered reasons, the Plaintiffs advance three main arguments: (1) Defendants could and should have asked Plaintiffs about the application components they had concerns about, (2) Defendants departed from their ordinary process and substantive criteria to reject the Plaintiffs' application, and (3) there are genuine disputes of material fact about whether Defendants harbor anti-Asian racial animus.

First, the Court disagrees with Plaintiffs' arguments that Defendants "could simply have asked" about information they found concerning or documents that were missing from the application. Surely the Defendants were only under an obligation to

review the documents and information that Plaintiffs provided in their application.  That

the "Board … may request additional information/documentation during the review

process" does not imply that they *must* do so.  *See* 2019 Application Form, Doc. 134-50

at 4.  For example, Defendants had no reason to question the accuracy of Plaintiffs'

November 2019 submission that they moved out of their Harlem condo in December

2014.[21]  Plaintiffs' argument that Defendants should have known to ask if the move out

date was correct at the time the application was submitted is unavailing.

Secondly, Plaintiffs argue that Defendants' application process was rife with

procedural irregularities.  The alleged irregularities are discussed in turn.

### 1. *The Special Committee*

Plaintiffs allege that after Defendants learned Xia's name (revealing her race and

national origin)[22] on July 10, 2019 they began to alter the application process to deter

Plaintiffs from purchasing the Unit, and were motivated to do so because of racial

animus.  Doc. 144 at 10.  It was at that time, Plaintiffs allege, that Defendants began

circumventing Board bylaws and notice requirements—by creating a "special committee"

for the sale of Unit 4.  The special committee was constituted to "conduct all

communications and decisions regarding the sale" of Unit 4.  Doc. 145-19.  The three

---

[21] A year and a half after the submission of the 2019 application, in a deposition taken in April 2021, Xia was unable to recall when exactly she moved out of the Harlem condo but "remember[s] moving out in the summer."  Xia Dep. 15:11–21.

[22] Plaintiffs argue that any cursory web search of "Xia" establishes it as a Chinese surname.  Doc. 1 ¶ 85. The Court takes judicial notice that Xia is a commonly known Chinese Surname.  *See United States v. Biaggi*, 673 F. Supp. 96, 101 (E.D.N.Y. 1987), *aff'd*, 853 F.2d 89 (2d Cir. 1988) (taking judicial notice that Italian-Americans are commonly identified by their last names).

members held a meeting at which they created the special committee, but gave Pinkowitz and Rymer less than 24 hours' notice of the meeting.  Doc. 145-4.

Plaintiffs claim that the short notice was a violation of the Building's bylaws. The relevant bylaw states that "special meetings … may be called… on one day notice." Doc. 145-33 at 10.

Plaintiffs also argue that there is a factual dispute as to whether the exclusion of Pinkowitz and Rymer from the Board was justified.  Defendants argue that these two Board members were excluded because they had "a concrete pecuniary interest in the sale."  Doc. 133 at 4.  In a July 29 email Elbert states Pinkowitz had information she should not have known and concluded that there is "proof of an ongoing conflict of interest."  Doc. 134-35 at 3.  She suggested that they remove Pinkowitz and Rymer so that "they cannot approve a sale or documents or other activities without consent of the rest of the board."  *Id*.  Pinkowitz testified that she was not involved as a broker on the anticipated sale, and did not communicate with Plaintiffs between the time that they submitted the application and the time their application was rejected.  Pinkowitz Dep. 14:24–15:6.  However, it is undisputed that Pinkowitz responded to a StreetEasy inquiry from Xia about Unit 4 on June 19, 2019, and that the Brown Harris Stevens listing reflected both Balan and Pinkowitz as brokers.  *See* Pls' Response to Defs' 56.1 St. ¶ 10.

There is conflicting evidence as to whether Pinkowitz was a broker on the sale of Unit 4, and therefore had an interest in the sale.  *See United States v. Shin,* No. 19 cr. 552 (JPC), 2022 WL 3274120, at *2 (S.D.N.Y. Aug. 11, 2022) ("A conflict of interest occurs, when, for instance, a … board member has an ownership interest or an 'indirect or direct financial interest' [in a transaction]").  The Court finds that there is a genuine issue of

fact as to whether Pinkowitz served as a broker on the transaction and therefore should have been excluded from the Board's consideration of the sale.

As to the exclusion of Rymer, Rojo acknowledged that sellers routinely participated in decisions to approve or reject prospective buyers. *See* Rojo Dep. 120:14-24 (confirming that it was not considered a conflict of interest to participate in the sale of your own apartment). In light of Rojo's testimony, the Court agrees that there are genuine issues of fact as to whether Rymer should have been excluded from participating in the Board's consideration of the sale.

### 2. *Revised Application and New Documentation*

Plaintiffs allege that the revised application also required them to include "additional unnecessary documentation never sought from previous applicants." Doc. 144 at 13. One such new requirement, the conflict of interest form, instructed Plaintiffs to "indicate in detail the nature of the professional and/or personal relationship or affiliation" among every party involved in the transaction. *See* 2019 Application form, Doc. 134-50 at 45. The table contained all parties to the sale and boxes in which applicants could detail, for example, the nature of the familial relationship between parties. In this case, the parties included the seller (Rymer), his broker (Balan), his attorney (Targownik), the buyers (Plaintiffs), and the buyers' attorney (Waiser). *See* 2019 Application, Doc. 134-6 at 26. The November 2019 application noted that a familial relationships existed, but did not disclose the nature of those relationships (e.g., that Balan and Pinkowitz were mother and daughter, that Balan and Targownik were married, etc.). *Id.* Additionally, the attorneys did not sign the affirmation. The special committee deemed this to be insufficient. *See* Unit 4 Purchase Application Review, Doc. 134-12.

With respect to the February 2020 application, it is disputed whether the special committee *required* Plaintiffs to submit the affidavits concerning the relationships among all parties involved in the sales transaction.  Defendants contend that they never required or even suggested these affidavits, but rather accepted Plaintiffs' offer to supply these affidavits to prove there were no conflicts.  Doc. 133 at 18.  Defendants offer contemporaneous emails sent by Elbert expressing frustration at Plaintiffs' insistence on complicating the process rather than simply providing the requested documents.  *See* Doc. 134-57 ("The 12/21/19 email was quite clear, that we just wanted 3 things: completed, application, complete broker agreement, removal of seller attorney.  Now they want to add all these affidavits, statements, substitutions, revisions, above and beyond those 3… why?  We would have been satisfied with our original requests!"); *see also* Sarmiento Dep. 182:4–183:4 (recalling that in lieu the supporting documents the special committee requested, someone proposed the affidavits as a solution, but that he does not recall whether it was the broker or the buyer); *but see* Rojo Dep. 171:13–172:21 (testifying that it "must have been the three of us [Rojo, Sarmiento, and Elbert]" who came up with the idea to request those affidavits, and that she believed that the drafts of the affidavits were created between Shapiro, Elbert, and Sarmiento).

Plaintiffs rely on testimony from Balan, who testified that in a meeting with Shapiro, Shapiro relayed that the special committee requested these affidavits.  Balan Dep. 70:3–71:8 ("the special committee wanted these legal papers, these affidavits put together").  According to Balan, at this meeting, Shapiro handwrote notes describing the content each affidavit should include.  *See* Doc. 145-30 (handwritten notes); *see also*

76:6-77:11.  Balan followed up in an email dated January 23, 2020 with her "proposed affidavits."  Doc. 134-58.

After rejecting Plaintiffs' application, the conflict of interest disclosure section was removed from the application form altogether.  *See* 2020 Application, Doc. 145-16. That this section was entirely removed after Plaintiffs were rejected arguably raises questions as to the intent of the requirement.

Concerning the revision of the application itself, Defendants argue that it was the Coop's practice to revise applications when new potential sales arose and that recent changes to the law required a revision of the application.  Doc. 150 at 6.  For example, Pinkowitz and Elbert revised the application that Sarmiento ultimately submitted in 2016 for the purchase of Unit 1.  *See* Doc. 145-24 (an email detailing the edits made to the application in November 2015).  However, the edits made in 2015 were not as substantive as the 2019 revisions, and focused more on clarifications, typographical errors, and formatting.  The Court finds that there are factual disputes regarding the changes made to the 2016 application, and what the intent and purpose of those changes were.  Because the changes in the application were a departure from the criteria used for past applicants, the Court finds that there is a genuine dispute as to whether the changes can be attributed to intentional discrimination.  *See Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202, 207 (2d Cir. 2010) (stating that one of the factors that can be considered in evaluating intentional discrimination is a departure from normal substantive criteria).

*3. Increase in Fees*

Next, Plaintiffs allege that the "onerous" new and increased fees and deposits required by the revised application, and Defendants' failure to plausibly explain why they were imposed, creates an inference of improper purpose. The revised application required approximately $12,000 more in fees and deposits for the seller than the previous application. Defendants argue that because $11,000 of the increase in fees are refundable, the increase is not significant. However, the Board retained complete discretion in assessing whether the conditions of the primary residence deposit (of $10,000) was met, Elbert Dep. 170:9–13, and as Sarmiento acknowledged in an email, these refundable fees "could represent a liquidity hit for most anyone, even if financially stable," especially in light of the uncertainty of the date of closing. Doc. 145-20 at 4.

There are disputes as to the purpose and intent of the primary residence deposit. In their sworn affidavits Elbert and Sarmiento claim— in the same language—that it was imposed to "incentivize purchasers to live up to their commitment to reside at, and participate in the management of, the Coop." Elbert Aff. ¶ 14; Sarmiento Aff. ¶ 13. However, Rojo testified that "now… looking here and reading it, [she] agree[s]" that the $10,000 fee was unusually high. Rojo Dep. 156:23–157:4. Without explanation, after rejecting Plaintiffs, the $10,000 deposit, along with most of the other increased fees, were removed from the 2020 application. *See* 2020 Application, Doc. 145-16 at 5.

Further, there are inconsistencies regarding the rationale for the application fee increase from $350 to $500. In her deposition taken in April 2021, Rojo testified that she believed the $350 application fee in place in 2016 was sufficient, Rojo Dep. 73:18–25, and that she did not remember why the fees were raised to $500 for Plaintiffs' application. *Id.* 155:21–156:2. Yet in her sworn affidavit in August 2022, she claimed

that the increased fees were necessary "to assure that the Coop was reimbursed for Board time spent on the transaction."  Rojo Aff. ¶ 11.

However, Defendants argue that "it simply makes no sense" that they consented to deferring all but $540 to be paid at closing if their intent was to increase the fees to deter the Plaintiffs from applying.  Doc. 150 at 6; *see also* Doc. 134-52 at 2.

The Court finds that the disputed testimony regarding the Defendants' knowledge and intent raise factual issues that are not appropriate for resolution on a motion for summary judgment.  *See Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir. 1984).

### 4. *The Review of the Applications*

Defendants agreed that Shapiro would "do a first look to check for compliance with income caps and tax disclosure, as well as minimal financial resources . . . and check[] for completeness."  *See* November 2019 Email, Doc. 145-20 at 2.  However, before receiving Shapiro's determination, Elbert sent an email to Sarmiento and Rojo stating that she "took a peak [*sic*]" and was "ready to reject the application."  Doc. 145-11 at 2.  She also stated "of course we will wait for [Shapiro's] decision" and that perhaps inviting the applicants to reapply with different brokers/attorneys, or with full discourse could be a path forward.  *Id.*  Rojo, without having reviewed the application, and before Shapiro had submitted her determination, responded that "[her] vote is to reject the application."  *Id.; see also* Rojo Dep. 164:2–166:19.

### a. *Financial Documents and Disclosures*

There is no dispute that the revised application explicitly required the two most recently filed Federal Income Tax Returns "inclusive of all W-2/1099 statements and all schedules."  However, that Sarmiento also failed to separately include several underlying tax forms when he applied and was not rejected, may raise an inference of discriminatory intent.  *See Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202, 207 (2d Cir.

2010) (stating that one of the factors that can be considered in evaluating intentional discrimination is a departure from normal substantive criteria).

Defendants also argue that they did disclose the student loan and Home Depot monthly payments, and that they did not submit any account statements because they did not receive monthly statements for those expenses.  There is no dispute that Plaintiffs indeed did list their student loan payments twice in the application.  *See* page 10A ("Other Income in 2018") 2019 Application, Doc.134-4 at 43; *see also* page 18 ("Annual Income Information") 2019 Application, Doc. 134-3 at 54.  But whether how Plaintiffs listed their monthly expenses (through bank statements and in "other" sections of the application) was reasonable presents a triable issue of fact on the question of Defendants' possible pretextual reasons for rejecting Plaintiffs' applications.

Lastly, Plaintiffs argue that Defendants falsely claim that the sale of the California property was a matter of concern.  While it is not disputed that Plaintiffs failed to disclose their ownership of the land on the designated page of the application, Plaintiffs disclosed the sale in their 2017 tax return, which was included with their November 2019 application.  But more importantly, the contemporaneous meeting minutes do no evince any concern about the sale.  *See generally* Doc. 134-64 at 1.  The fact that the sale of the property was "first enunciated some time after the Plaintiffs challenged the board's decision, contributes to the Plaintiffs' claim of pretext."  *Sassower v. Field*, 752 F. Supp. 1182, 1189 (S.D.N.Y. 1990) (denying a coop's motion for summary judgment, in part, because the 14 reasons stated for rejecting plaintiff's application were not contemporaneous and could be deemed to be a pretext for discrimination).

b. *Income Caps*

Plaintiffs argue that only the year of the expected transaction must meet the income cap and that Defendants contorted the income definitions and requirements to justify rejecting Plaintiffs' applications. *See* Pl's Opp. to Motion to Dismiss, Doc. 30 at 12.

The purchase application simply asks for "adjusted gross income as reflected in your federal tax return," without specifying which year's AMI cap these figures would be compared to. Doc. 134-50 at 11. The Certificate of Incorporation is similarly ambiguous, noting only that qualified applicants' income cannot exceed 165% AMI "as determined from time to time by [HUD]." Doc. 134-1 at 5.

Defendants disagree and assert that the procedure the Board utilized to assess whether an applicant meets the income cap was correct. The Board compared the income on applicants' last two tax returns, along with the family size, to the AMI chart. *See* Elbert Dep. 30:14–25 (describing the process of comparing the reported income on applicants' tax returns and the family size to the AMI chart for the given year and stating that "that's the way to do it, we have always done it that way"). In other words, according to Defendants, the Plaintiffs also needed to meet the income caps for the two years prior to the transaction. Doc. 133 at 12.

On March 24, 2020, twenty-two days after rejecting Plaintiffs' second application, Elbert emailed UHAB to ask about the income eligibility requirements. Doc. 145-27 at 3. The UHAB advised Elbert that the Board "should look at 2 to 3 yrs of tax returns, however [applicants] only have to qualify with [the] most recent tax return, which would be 2019," and that "there's no statute" that requires that an applicant's eligibility be determined solely by reference to their most recent tax return.

*Id.* at 2.  The Court agrees with Plaintiffs that "a jury could reasonably find that if Plaintiffs' [financial] eligibility had been the sole basis for the rejection, the special committee would have sought to learn the applicable financial requirements *before* rejecting them."  Doc. 144 at 28 (emphasis in original).

*       *       *

One indication of "racially discriminatory intent" are "[d]epartures from the normal procedural sequences."  V*illage of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977).  Plaintiffs have pointed out a number of instances in which their application was treated significantly differently from those of previous applicants:  the hasty establishment of a special committee, which excluded two Board members due to purported conflicts of interest; the unprecedented revision of the application and required documents; the increase of approximately $12,000 in fees; and the immediate reversal of these changes after rejecting Plaintiffs' application.

Drawing all inferences in Plaintiffs' favor, a fact-finder could conclude that Defendants' review of Plaintiffs' application supports an inference of discriminatory intent.  Accordingly, Plaintiffs meet their burden at the third stage of the *McDonnell Douglas* analysis.

### D.  Racial Animus

In support of their argument that the rejection of their application was motivated by racial animus, Plaintiffs proffer the fraught relationship between Rojo and Cindy Zhou and evidence of a general pattern of discrimination by Defendants against

Asian-Americans, as well as Rojo's anti-Asian contemporaneous statements regarding Plaintiffs' application.

### 1. Treatment of Other Asian Americans by the Board

Plaintiffs argue that a March 24, 2017 text exchange between Elbert and Rojo indicates discussing Zhou racial animus.  Doc. 145-15 ("Elbert:  What is the name of your Asian roommate and when did she move in[?]  Elbert: I want to write a letter from the coop that says miss Asian is authorized and [H]elen is not").  For context, during this time, Rojo was renting two rooms in her unit:  one to Zhou, who is Asian, and one to another, non-Asian person named Helen, who had failed to pay her rent.  As a solution, Elbert proposed that the Coop write a letter that Zhou was authorized to be in the apartment and Helen was not.  Elbert testified that she does not recall referring to Zhou as "Miss Asian."  Elbert Dep. 216:2–17.

Next, Plaintiffs point to a number of emails and text messages Rojo sent to Board members in which she repeatedly disapproved of Zhou living in the building, referred to her as "that person from the fourth floor" and as "a squatter."[23]  Further, in another text messages Rojo sent to members of the Board in March 2020 about "the tenant living on the 4th floor," she stated that she knows that tenant "for sure doesn't clean[] disinfect[] healthy hygiene" and "does her shopping from Chinatown."  Doc. 145-14 at 19.  Plaintiffs submit that Rojo is referring to Zhou.[24]

Lastly, Plaintiffs allege that an anti-Asian animus can be inferred from Defendants' general pattern of discrimination against Asian-Americans.  According to Plaintiffs, the only other buyers who have been rejected also consisted of a European husband and Asian wife.  *See* Rojo Dep. 62:2–68:20 (confirming that the applicants were

---

[23] In her deposition, Rojo testified that she "adore[s] [Zhou]," was angry and hurt about their falling out, and that she "didn't mean anything personal towards [Zhou]."  Rojo Dep. 193:9–194:25.

[24] In her deposition, Rojo testified that she was "probably" referring to a different tenant on the fourth floor. Rojo Dep. 204:21-206:8.

rejected, and that there was a note in the Board's communications about the applicant's father being in Taiwan). Plaintiffs do not provide any other information on the sufficiency of the couple's application or if the application was similar to that of the buyer that was approved. *See Jackson v. City of New York*, 29 F. Supp. 3d 161, 172 (E.D.N.Y. 2014) (finding that to establish disparate treatment a plaintiff must demonstrate that he was treated materially different than similarly situated [person] outside of his protected class).

Further, Plaintiffs allege that "Rojo attempted to disinfect" a prospective Asian buyer with Lysol. Doc. 144 at 23. Balan testified that after Plaintiffs were rejected, she was showing Unit 4 to another potential buyer, who was also Asian, and his broker. As they were leaving, Rojo, who was in the lobby, began to spray Lysol. Balan testified that "it almost felt like an assault" and that "it was bizarre." *See* Balan Dep. 102:18–103:5, 103:13–16.

Because there are genuine disputes of material facts regarding these alleged incidents, and "careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination" the "drastic remedy" of summary judgment in this discrimination case is denied. *See Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999).

### 2. *Rojo's Comments About Plaintiffs' Applications*

Finally, Plaintiffs argue that beginning in August 2019, Rojo began to comment negatively about them. In an August 29, 2019 email to the special committee, Rojo says "I don't know if we want this kind of neighbor…" Doc. 145-6 at 2. Rojo was responding to an email from Rymer in which he asks why the application was being revised at this time and notes that a delay may cause him to lose the sale. The context of this email, and indeed the portion of the sentence Plaintiffs omit from their brief ("I

don't know if we want this kind of neighbor already (supposedly) pressing" makes it clear that Rojo is referring to the Plaintiffs "supposedly pressing" for a quicker process.

Plaintiffs also allege that after learning Xia's name (and therefore her race), but before the applications were submitted, Rojo repeatedly lobbied the other two members of the special committee to reject Plaintiffs. Plaintiffs offer two examples of such occasions. First, Rojo's statement in a September 11, 2019 email that she is "extremely very uncomfortable and not satisfied with any of them" and is thinking of rejecting the applicant. Doc. 145-8 at 2. Plaintiffs argue that this shows a hostility toward Xia. However, Plaintiffs fail to account for the full context of the communication. In fact, Rojo says, in full:

> After reading and really thinking [] with an open fair mind- the present situation with [Pinkowitz/Balan] … and this lawyer involvement in the sale of unit 4- I must admit [at] this point I'm extremely very uncomfortable and not satisfied with any of them, I'm thinking we should reject the applicant.

*Id.* This message was a response to Elbert's frustration with Waiser for paying the Due Diligence fee late, and Pinkowitz and Balan for their involvement in the delay. *Id.* Plaintiffs also argue that a September 8, 2019 email in which Rojo stated "sorry to say I'm not feeling it" in reference to a letter Plaintiffs sent to the special committee members apologizing for the delay in the Due Diligence fee, also shows racial animus. Doc. 145-7.

Next, Plaintiffs argue that Rojo's comments regarding their two applications contain evidence of discriminatory intent. For example, after the November 2019 application was submitted, but before reviewing the application, Rojo sent an email response to Elbert commenting that she does not "do well with dishonest/people and special [*sic*] when they play games" and that her vote was to reject the application. Doc.

145-11 at 2.  Yet Elbert's original message, to which Rojo is responding, makes it clear that Rojo is referring to Pinkowitz and Balan ("The lack of broker contract is particularly problematic.  I know for a fact … that Samantha was originally a co-broker… at this point I am tired of their games and I am ready to reject the application.").  *Id.*

Lastly, after reviewing Plaintiffs' February 2020 application Rojo states in an email to the special committee that she is "baffle[d] with all that … B[ullshit] and garbage these people can write down on paper."  Doc. 145-12 at 5.

Because, taken in sum, a reasonable jury could find Rojo's comments to be harboring racial animus and "contemporaneous statements by decision-makers evidencing animus" are a relevant consideration for discerning a racially discriminatory intent, summary judgment is precluded.  *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

The Court must tread lightly in deciding whether summary judgment should be granted in a discrimination case that turns on intent.  "It is the rare occasion when discrimination boldly smacks one in the face, rather, it is 'often accomplished by discreet manipulations and hidden under a veil of self-declared innocence.'"  *Fair Hous. Justice Ctr., Inc. v. Edgewater Park Owners Co-op.*, 10 Civ. 912, 2012 WL 762323, at *8 (S.D.N.Y. 2012) (citing *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir. 1991)).

It is apparent that the Plaintiffs' claims against the Defendants cannot be resolved on summary judgment because a reasonable jury could find that Defendants' actions were motivated by discrimination.  *Reeves*, 530 U.S. at 91.  The Plaintiffs have stated the elements of a *prima facie* case of housing discrimination and the Defendants have articulated nondiscriminatory reasons for their actions.  The question of pretext, however,

is one that must be decided by a jury.  Taken altogether, there is sufficient evidence such

that a rational jury could conclude that Defendants' reasons for rejecting Plaintiffs'

applications were pretextual and motivated by racial animus.  The nature of the evidence

is such that a jury's evaluation is required.  Accordingly, the Defendants' motion for

summary judgment is denied.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is
DENIED.  The parties are directed to appear for a telephonic conference on April 6, 2023,
at 11:00 a.m.  To participate, the parties are directed to call (877) 411-9748 and enter
access code 3029857# when prompted.  The Clerk of the Court is respectfully directed to
terminate the motion, Doc. 132.

It is SO ORDERED.

Dated:    March 31, 2023
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.